**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| COMMUNITY HEALTH SYSTEMS, INC., *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> SYLVIA MATHEWS BURWELL, *Secretary, U.S. Dep't of Health and Human Services* <br><br> Defendant. | Civil Action No. 14-1432 (BAH) <br><br> Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

Pending before the Court are cross-motions for summary judgment from the plaintiffs, a group of hospitals owned by Community Health Systems, Inc. ("CHS"), Pls.' Mot. Summ. J. ("Pls.' Mot."), ECF No. 15-1, and the defendant, the Secretary of Health and Human Services ("HHS"), who is sued in her official capacity, Def.'s Mot. Summ. J. ("Def.'s Mot."), ECF No. 19.[1]  The plaintiffs were denied $16,400,811 in reimbursements for "bad debt" incurred in the treatment of Medicare patients during fiscal years 2004 through 2006.  First Am. Compl. ("FAC") ¶¶ 5, 32, ECF No. 7; Def.'s Mem. Supp. Def.'s Mot. at 1 ("Def.'s Mem."), ECF No. 19. The plaintiffs allege that this reimbursement denial violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and a Congressional moratorium, in effect from 1987 through 2012, that barred any change in HHS policy regarding reimbursement of Medicare bad debt.  FAC ¶ 1; Pls.' Corrected Mem. Supp. Pls.' Mot. ("Pls.' Mem.") at 1, ECF No. 15-1.  The defendant

---

[1] The plaintiffs have requested oral argument on the pending motions, Pls.' Mot. at 1, but given the sufficiency of the parties' written submissions, this request is denied. *See* LCvR 7(f) (stating allowance of oral hearing is "within the discretion of the court").

counters that the policy under which HHS denied the reimbursements is both reasonable and

long-standing, having existed at the time the Medicare Bad Debt Moratorium took effect.

Consequently, the defendant maintains that the challenged reimbursement denial reflects no

policy change that would violate the Moratorium.  Def.'s Mem. at 2.  For the reasons set forth

below, the defendant's motion is granted and the plaintiffs' motion is denied.

## I.    BACKGROUND

Resolving the instant motions requires a tour of the "labyrinthine world of Medicare

reimbursements."  *District Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 48 (D.C. Cir. 2015)

(internal quotation marks omitted).  The relevant portions of the Medicare statute are explained

first, followed by the history of the Medicare Bad Debt Moratorium, before the Court addresses

the reimbursement decision challenged by the plaintiffs.

### A.    General Medicare Reimbursements and Appeals Therefrom

"Medicare is a federally funded medical insurance program for the elderly and disabled

. . . [e]stablished as part of the Social Security Act, 42 U.S.C. § 1395 *et seq.*"  *Fischer v. United*

*States*, 529 U.S. 667, 671 (2000).  Inpatient hospital care is generally covered under Part A of the

Medicare Act.  42 USC §§ 1395c–1395i-5.  The Centers for Medicare and Medicaid Services

("CMS"), "formerly the Heath Care Financing Administration (HCFA), administers the

Medicare program on behalf of the Secretary" of HHS. *St. Luke's Hosp. v. Sebelius*, 611 F.3d

900, 901 n.1 (D.C. Cir. 2010) (internal citation omitted).

The Secretary is required by statute to delegate most of "[t]he administration of [Part A]

. . . through contracts with [M]edicare administrative contractors."  42 U.S.C. § 1395h(a).[2]

---

[2] During the cost years at issue in the instant matter, Medicare administrative contractors were known as "Fiscal Intermediaries."  *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub L. No. 108-173 § 911(e), 117 Stat. 2066, 2386 (2003).  Consequently, the Court refers to these entities as "Fiscal

These contractors, known as "Intermediaries," are responsible for, *inter alia*, "[d]etermining . . . the amount of the payments required . . . to be made to providers of services, suppliers and individuals," to make those payments, and provide communication, education, and technical assistance to health care providers treating Medicare patients.  *Id.* § 1395kk-1(a)(4).  In order to receive payment from the Medicare program, through the Intermediaries, health care providers such as the plaintiffs must submit "cost reports . . . on an annual basis."  42 C.F.R. § 413.20(b).  After receiving and reviewing these cost reports, Intermediaries "must within a reasonable period of time . . . furnish the provider . . . a written notice reflecting the contractor's determination of the total amount of reimbursement due the provider."  *Id.* § 405.1803(a).  These notices, which "[e]xplain the [Intermediary's] determination of total program reimbursement due the provider" are known as notices of program reimbursements ("NPRs").  *See id.* § 405.1803(a)(1)(i).

When dissatisfied with an NPR, a provider may seek review of, and a hearing regarding the Intermediary's decision before, the Provider Reimbursement Review Board ("PRRB" or "Board"), so long as certain jurisdictional requirements, which are not at issue here, are met.  42 U.S.C. § 1395oo(a).  "A decision of the Board shall be final unless the Secretary, on his own motion . . . reverses, affirms, or modifies the Board's decision."  *Id.* § 1395oo(f)(1).  The Secretary has delegated responsibility for hearing appeals from PRRB decisions to the CMS Administrator.  *See* 42 C.F.R. § 405.1875; *Mercy Home Health v. Leavitt*, 436 F.3d 370, 374 (3d Cir. 2006).  The dissatisfied provider, or, as in this case, a group of dissatisfied providers, may file a civil action challenging the PRRB or the Administrator's final decision in the "District Court of the United States for the judicial district in which the greatest number of providers

---

Intermediaries" or "Intermediaries," as did the Provider Reimbursement Review Board ("PRRB") in the decision challenged in the instant action.

participating in both the group appeal and the civil action are located or in" this District.  42

C.F.R. § 405.1877(e)(2).

### B.     Medicare Bad Debt Reimbursements

The Medicare statute provides that non-Medicare patients shall not be forced to share the

cost of treatment for Medicare patients.  42 U.S.C. § 1395x(v)(1)(A)(i).  This ban on cross-

subsidization effectively requires that "the necessary costs of efficiently delivering covered

services to individuals covered by" Medicare "will not be borne by individuals not so covered."

*Id.*  Although the costs incurred for most of the care provided to Medicare patients are borne by

the government, individual Medicare patients are "often responsible for both deductible and

coinsurance payments for hospital care."  *Hennepin Cnty. Med. Ctr. v. Shalala* (*Hennepin*

*County*), 81 F.3d 743, 745 (8th Cir. 1996).  If Medicare patients fail to pay this portion of their

care, Medicare allows for reimbursement of these "bad debts" so long as certain criteria are met.

42 C.F.R. § 413.89(e).  The principle underlying the reimbursement of Medicare bad debt is

straightforward: "This policy, adopted in 1966[,] . . . was originally intended to prevent costs of

beneficiary care from being shifted to non-Medicare patients," in keeping with the statutory

cross-subsidization ban in § 1395x(v)(1)(A)(i).  U.S. Dep't of Health and Human Servs., Ofc. of

Inspector Gen., *Semiannual Rep. to the Congress* (Apr. 1, 1986–Sept. 30, 1986) ("1986 OIG

Report") at 2.[3]

"Bad debts" in the Medicare context are defined as "amounts considered to be

uncollectible from accounts and notes receivable that were created or acquired in providing

services."  42 C.F.R. § 413.89(b)(1).  Such debts are "attributable to the deductibles and

---

[3] For the cost years at issue, the plaintiffs were limited by statute to reimbursement of seventy percent of the bad debts claimed, but this rate has declined under current law to sixty-five percent of bad debt claimed.  *See* 42 U.S.C. § 1395x(v)(1)(T)(iv).

coinsurance amounts" billed to Medicare patients.  *Id.* § 413.89(a); *see also* Def.'s Mot. Ex. 1 (Provider Reimbursement Manual ("PRM"), Chapter 3) § 300, ECF No. 19-1.  For reimbursement of bad debt arising from nonpayment of coinsurance and deductible amounts due from Medicare patients, a hospital must satisfy the following four criteria:

> (1) The debt must be related to covered services and derived from deductible and coinsurance amounts. (2) The provider must be able to establish that reasonable collection efforts were made. (3) The debt was actually uncollectible when claimed as worthless. (4) Sound business judgment established that there was no likelihood of recovery at any time in the future.

42 C.F.R. § 413.89(e).  While the regulations do not define key terms used in these criteria, such as "reasonable collection efforts," "uncollectible," "worthless," and "likelihood of recovery," *see id.,* the HHS sets out interpretive instructions, policies and procedures in the PRM, *see Catholic Health Initiatives* (*CHI*) *v. Sebelius*, 617 F.3d 490, 491 (D.C. Cir. 2010) (describing PRM as "guidelines and policies to implement Medicare regulations which set forth principles for determining the reasonable cost of provider services, but it does not have the effect of regulations") (internal quotation marks omitted).

The opening paragraph of PRM § 310 sets out HHS' interpretation of the phrase "reasonable collection effort" as follows:

> To be considered a reasonable collection effort, a provider's effort to collect Medicare deductible and coinsurance amounts must be similar to the effort the provider puts forth to collect comparable amounts from non-Medicare patients.  It must involve the issuance of a bill on or shortly after discharge or death of the beneficiary to the party responsible for the patient's personal financial obligations.  It also includes other actions such as subsequent billings, collection letters and telephone calls or personal contacts with this party which constitute a

> genuine, rather than a token, collection effort.  The provider's collection effort
> may include using or threatening to use court action to obtain payment.

Administrative Record ("AR") at 371 (PRM § 310), ECF No. 24-1.[4]  As this portion of PRM §

310 makes clear, a "reasonable collection effort" requires both the issuance of a bill and similar

treatment of Medicare and non-Medicare bills.

　　　The second paragraph of PRM § 310, subsection A specifically addresses the use of

collection agencies, stating that "[a] provider's collection effort may include the use of a

collection agency," without mandating such use.  *Id.* (PRM § 310.A).  If a provider chooses to

refer Medicare debt to a collection agency, HHS "expects the provider to refer all uncollected

patient charges of like amount to the agency without regard to class of patient," consistent with

the policy expressed in the opening paragraph that both Medicare and non-Medicare debt be

treated similarly.  *Id.*

　　　A "presumption of noncollectibility" applies to bad debts "[i]f after reasonable and

customary attempts to collect a bill, the debt remains unpaid more than 120 days from the date

the first bill is mailed to the beneficiary."  AR at 373 (PRM § 310.2).  In such circumstances, the

PRM provides that "the debt may be deemed uncollectible."  *Id.*

　　　If a hospital collects on a bad debt after Medicare has reimbursed the debt, procedures are

in place to prevent double recovery to the hospital.  Specifically, PRM § 316 provides that

"[w]here the provider was reimbursed by the [Medicare] program for bad debts for the reporting

period in which the amount recovered was included in allowable bad debts, reimbursable costs in

the period of recovery are reduced by the amounts recovered."  AR at 375 (PRM § 316).  Put

---

[4] Pursuant to Local Civil Rule 7(n)(1), the parties timely submitted "an appendix containing copies of those portions of the administrative record that are cited or otherwise relied upon in any memorandum in support of or in opposition to any dispositive motion."  This appendix, consisting of 350 pages, is docketed at ECF No. 24-1.  The defendant subsequently provided, at the Court's direction, two discs containing the entire AR, which consists of 4,048 pages. *See* Minute Order, June 18, 2015.

simply, if a provider collects on a bad debt after being reimbursed by Medicare, the provider's

future Medicare reimbursements are reduced by an identical amount.  *Id.*

      **C.**      **The Bad Debt Moratorium**

      Since the beginning of the Medicare program, the government has reimbursed a

substantial percentage of Medicare bad debt incurred by providers in order "to prevent costs of

beneficiary care from being shifted to non-Medicare patients."  1986 OIG Report at 2.  By the

mid-1980s, however, elimination or radical alteration of this practice became the subject of

policy debates.  *Id.* at 3.  The debate was prompted by changes to the Medicare reimbursement

system made in 1983 as part of the Reagan Administration's Social Security Act amendments,

which moved from directly reimbursing hospitals for the cost of treating Medicare patients to a

fixed cost per diagnosis, allowing hospitals to turn a profit on what had previously been a zero

sum game.  *See* Spencer Rich, *Getting Rich Off Medicare? Levels of Hospital Profits Are*

*Scrutinized as the Government Tries to Balance its Budget*, The Wash. Post (Oct. 27, 1987).

This shift, in the view of HHS' Office of Inspector General ("OIG"), meant "the original intent

of reimbursing hospitals for bad debts no longer seems appropriate."  1986 OIG Report at 3.

Based on this view, the 1986 OIG Report recommended modification of the bad debt

reimbursement system to hospitals in two alternative ways: "either discontinue Medicare

payments to [] hospitals for beneficiary bad debts or, in coordination with [the Social Security

Administration], pursue legislative authority to recover payments for beneficiaries bad debts

through benefit payment offsets."  *Id.*

      The HHS OIG proposal met with resistance in Congress and within the health care

industry.  *See* Joe Davidson, *U.S. to Propose Ending Reimbursement to Hospitals of Unpaid*

*Medicare Debts*, The Wall Street J. (July 2, 1987); Joe Davidson, *HHS Weighs Plan of*

*Garnishment for Medicare Bills*, The Wall Street J. (Dec. 3, 1986).[5] In response, Congress

enacted the so-called "Medicare Bad Debt Moratorium" (or the "Moratorium") as part of the

Omnibus Budget Reconciliation Act of 1987. Pub. L. 100-203, § 4008(c), 101 Stat. 1330, 1330-

55 (1987); *Hennepin County*, 81 F.3d at 747. With subsequent amendments in 1988 and 1989,

Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647 § 8402, 102 Stat 3342,

3798 (1988); Omnibus Budget Reconciliation Act of 1988, Pub. L. No. 101-239, § 6023, 103

Stat. 2106, 2167 (1989), the Moratorium prevented HHS from "mak[ing] any change in the

policy in effect on August 1, 1987 . . . relating to unrecovered costs associated with" Medicare

bad debt. 101 Stat. 1330-55.[6]

     The Moratorium did not precisely describe the "policy" to which any "change" was

prohibited. Given the context and recommendations set out in the 1986 OIG Report, *see supra*,

the initial Moratorium appeared aimed at preventing HHS from abolishing reimbursement for

Medicare bad debt or garnishing social security checks, as the HHS OIG had recommended.

---

[5] An impetus for the HHS OIG recommendations appears to have been a White House mandate "that increased funding for AIDS programs would have to come from other department programs" at HHS. Joe Davidson, *U.S. to Propose Ending Reimbursement to Hospitals of Unpaid Medicare Debts*, The Wall Street J. (July 2, 1987). At the time, critics called the mandate, which was coupled with the proposal to cut Medicare reimbursements, "an attempt by the [Office of Management and Budget] and the Reagan administration to force two desperate situations to compete." *Id.*

[6] As of 1989, the full Moratorium, as amended, provided that:

    In making payments to hospitals under title XVIII . . . of the Social Security Act, the Secretary of Health and Human Services shall not make any change in the policy in effect on August 1, 1987, with respect to payment under title XVIII of the Social Security Act to providers of service for reasonable costs relating to unrecovered costs associated with unpaid deductible and coinsurance amounts incurred under such title (including criteria for what constitutes a reasonable collection effort, including criteria for indigency determination procedures, for record keeping, and for determining whether to refer a claim to an external collection agency ). The Secretary may not require a hospital to change its bad debt collection policy if a Fiscal Intermediary, in accordance with the rules in effect as of August 1, 1987, with respect to criteria for indigency determination procedures, record keeping, and determining whether to refer a claim to an external collection agency, has accepted such policy before that date, and the Secretary may not collect from the hospital on the basis of an expectation of a change in the hospital's collection policy.

42 U.S.C. § 1395f note.

Additional nuance is provided by the Conference Report accompanying the 1988 Amendment to the Moratorium, which report expressed "concern[] about recommendations made by the Inspector General of HHS . . . and actions which may be taken by the Secretary in response to those recommendations, regarding bad debt collection policies followed by certain hospitals." H.R. Rep. No. 100-1104, at 25 (1988) (Conf. Rep.), *reprinted in* 1988 U.S.C.C.A.N. 5048, 5337.[7] The conferees explicitly objected to certain OIG "recommendations," including those concerning "the provider's responsibility regarding a decision to use a collection agency for Medicare bad debt," which the conferees stated "may have the effect of violating the prohibition on changes in policy if the Secretary's response results in the retroactive disallowance of bad debt payments claimed by the hospitals." *Id.* The conferees "clarif[ied] that the Congress intended that the actions of Fiscal Intermediaries occurring prior to August 1, 1987 to approve explicitly [a] hospital's bad debt collection practices, to the extent such action by the Fiscal Intermediary was consistent with the regulations, PRRB decisions, or program manuals and issuances, are to be considered an integral part of the policy on that date, and thus not subject to change." *Id.* Significantly, at the same time, the conferees did not "intend to preclude the Secretary from disallowing bad debt payments based on regulations, PRRB decisions, manuals, and issuance[s] in effect prior to August 1, 1987." *Id.*

The third amendment to the Moratorium in 1989 further clarified the effect of the Moratorium on hospitals that had relied on pre-1987 decisions by their Intermediaries regarding bad debt reimbursements. *See* H.R. Rep. No. 101-247, at 918 (1989), *reprinted in* 1989 U.S.C.C.A.N. 1906, 2389. This amendment, which was made retroactive to August 1, 1987,

---

[7] The November 1988 amendment added the following language to the Moratorium: "including criteria for indigency determination procedures, for record keeping, and for determining whether to refer a claim to an external collection agency." Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, § 8402, 102 Stat. 3342, 3798, 42 U.S.C. § 1395f note.

added the following language to the Moratorium: "the Secretary would be prohibited from directing the hospital to change its policy, or collecting retroactively from the hospital based upon the expectation of a change in the hospital's collection policy." *Id.*

The parties have cited to no legislative history for the Moratorium that references any "policy" as of August 1, 1987 regarding the allowance, or disallowance, of bad debt reimbursement for accounts still active at collection agencies, and the Court has located no such reference. The two amendments to the Moratorium focused almost exclusively on the relationship between hospitals and their Fiscal Intermediaries, effectively requiring Intermediaries to continue their pre-1987 policies regarding bad debt reimbursement, provided such policies were both (1) explicitly stated by the Intermediary and (2) "consistent with the regulations, PRRB decisions, or program manuals and issuances" made by HHS prior to August 1, 1987. *See* 42 U.S.C. § 1395f note. As the Eighth Circuit noted in *Hennepin County*, "Congress was motivated" in passing the Moratorium "to prevent unexpected consequences to providers from the [HHS] inspector general's proposed changes in the criteria for bad debt reimbursement." 81 F.3d at 750–51. "It appears Congress merely sought to freeze a moment in time, forbidding the Secretary to change the criteria" for bad debt reimbursement after August 1, 1987, "but allowing full enforcement of the policies in place before it." *Id.* at 751. This conclusion is bolstered by the 1988 Conference Report, which stated that Congress did not intend to stop the Secretary from prohibiting bad debt reimbursements so long as such denials were consistent with the policies in place when the Moratorium took effect. *See* H.R. Rep. No. 100-1104, at 25.

The Moratorium was repealed by Middle Class Tax Relief and Job Creation Act of 2012, Pub. L. 112-96, § 3201(d), 126 Stat. 156, 192–3 (2012), for "cost reporting periods beginning on or after October 1, 2012."

### D.     The Plaintiffs' Collection Practices

The relevant facts in this matter are undisputed.  The parties stipulated before the PRRB that during the cost years at issue, some of the plaintiffs were owned by CHS, while "certain hospitals in the [case] were owned by Triad Hospitals, Inc. and were later acquired by CHS." AR at 10 (Challenged PRRB Decision).  The parties also stipulated that (1) all of the "bad debts at issue . . . are related to covered services and derived from deductible and coinsurance amounts," (2) the plaintiffs maintained a "policy to actively pursue all debts for at least 120 days prior to writing them off as bad debt" and (3) the plaintiffs complied with their policy.  *Id.* Additionally, the parties do not dispute that after "at least 120 days of in-house collection activities," the plaintiffs "forwarded uncollected accounts to outside collection agencies, and wrote the accounts off as 'bad debts.'"  *Id.* at 11.  Any amounts recovered by the collection agencies were offset, pursuant to PRM § 316, and the collections efforts engaged in by the plaintiffs "were similar for all patients regardless of" whether the patients were using Medicare. *Id.*  The plaintiffs "concede that the bad debts at issue . . . were claimed while such debts were being worked by an outside collection agency after more than 120 days of in house collection efforts."  *Id.*  In turn, the Intermediaries concede that "[t]he sole bases for the [] disallowance of the bad debts at issue is that the provider wrote the accounts off as worthless even though there was no evidence that the delinquent accounts were recalled by the provider or that the collection efforts ceased by the collection agency."[8]  *Id.*

---

[8] The plaintiffs refer to this policy as the "presumption of collectibility," Pls.' Mem. at 1, but the Court declines to adopt this nomenclature for two reasons.  First, while the phrase "presumption of noncollectibility" appears as the

The parties do not dispute that in 2002, the Intermediary for the CHS plaintiffs—though not for the Triad plaintiffs—"reviewed CHS' collection practices and issued a letter" noting that "[t]he regulations state the provider can presume [bad] debt uncollectable and write it off after 120 days, assuming they have made consistent collection efforts (Medicare vs. Non-Medicare/Private Pay) as noted" in 42 C.F.R. § 413.89(e).  AR at 11 (PRRB Decision); *see also* AR at 2053 (Letter, dated Oct. 8, 2002, from Regional Manager-Central Region, Medicare Audit and Reimbursement, Mutual of Omaha Ins. Co. to CHS).  The Intermediary observed in the 2002 letter, which was issued fifteen years after the effective date of the Moratorium, that "[t]he [Medicare] regulations do not state that a provider cannot continue collection efforts (with a related party or unrelated party) after being written off" and, based on this regulatory silence, opined that "[w]e see no reason why the related party relationship [between CHS and the collection agency] should interfere with or obscure the determination of the allowability of the Bad Debt claim."  AR at 2053.  This letter does not otherwise reference or describe the Intermediary's or the plaintiffs' pre-Moratorium practices regarding reimbursement of Medicare bad debt referred to a collection agency.  *See id.* at 2052–53.

In a subsequent 2006 letter, "the Intermediary informed CHS that the Medicare program will not reimburse deductible and coinsurance amounts while they are being worked by a collection agency."  *Id.* at 11 (internal quotation marks omitted).  According to the plaintiffs, the 2006 Intermediary letter disallowing reimbursement for Medicare bad debt still referred to a collection agency was a "complete surprise" and reflected a policy that "hadn't been applied in the audit experiences that [CHS] had."  Pls.' Mem. at 33.  The plaintiffs claim that they

---

title of PRM § 310.2, AR at 373, the plaintiffs' phrase does not appear in either Medicare regulations or the PRM. Moreover, the plaintiffs' phrase is a misnomer, since the agency's policy expresses no "presumption" regarding the likelihood of bad debt collection but instead reflects an interpretation of the operation of all four criteria set out in 42 C.F.R. § 413.89(e).

12

"formulated their bad debt collection policies based on the presumption of noncollectability [sic]" in PRM § 310.2, and in collaboration "with the Intermediary," which "specifically confirmed the adequacy of that policy" reflected in the earlier 2002 letter.  AR at 13.  The plaintiffs' practice is to "continue in-house collections even after the minimum time (*i.e.*, 120 days) has passed until the business office manager" for each hospital "personally reviews and signs of on each debt prior to writing off that debt" as bad debt.  *Id.*  Once written off, the debt is sent to a collection agency and the plaintiffs "are not involved with the debts after they are written-off unless there is a successful collection effort by the collection agency."  *Id.*

### E.      The Challenged Decision

The plaintiffs challenge the PRRB's decision upholding the Intermediaries' denial of bad debt reimbursement, totaling $16,400,811, to six hospitals in 2004, fifty-four hospitals in 2005, and fifty-eight hospitals in 2006.  AR at 10; Pls.' Mem. at 8.[9]  Each of the hospitals involved had their bad debt reimbursement denied "because the Providers' debts were still at a collection agency."  AR at 10.  The PRRB ruled that the Intermediaries' "adjustments to remove the Medicare bad debts . . . while the debts were still at the collection agency were proper."  *Id.* at 15.  In reaching this conclusion, the PRRB considered both prongs of the Moratorium barring the Secretary from (1) changing HHS' bad debt reimbursement policy in effect on August 1, 1987; and (2) requiring "a provider to change its bad debt collection policy when the Intermediary had accepted that policy prior to August 1, 1987."  *Id.*

The PRRB determined that only the first prong was at issue since "there [was] nothing in the record to document or confirm what the [plaintiffs'] policy was prior to August 1, 1987," and, therefore, no evidence had been presented regarding whether the Secretary had required the

---

[9] The full text of the challenged PRRB decision is found in the AR at pages 6–31.

plaintiffs to change their policy after prior acceptance by an Intermediary.  *Id.*  Specifically, the

PRRB noted that at the evidentiary hearing, the plaintiffs' "witness testified . . . that he had no

knowledge as to what the [plaintiffs] were reimbursed by the Intermediary prior to August 1,

1987" and, further, "there is nothing in the record to document or confirm what the Provider's

policy was prior to August 1, 1987."  *Id.*[10]  As a result, the PRRB found that the second prong of

the Moratorium was not implicated in this case.  *Id.*

While acknowledging the "presumption of noncollectibility" in PRM § 310.2, on which

the plaintiffs assert they based their bad debt collection practices, AR at 13, the PRRB noted that

this section "does not create an automatic presumption after the passage of 120 days" allowing a

provider to be reimbursed for any bad debts still pending at that time, *id.* at 19.  Instead, "it is a

discretionary presumption and does not foreclose the possibility that a debt may still be deemed

collectible after 120 days," citing the section's permissive language that after 120 days a debt

"*may* be deemed" uncollectible.  *Id.* (emphasis added).  The PRRB noted that PRM § 310.2

"does not excuse a provider from satisfying the other criteria specified in" the HHS regulations

governing reimbursement of bad debt.  *Id.* at 20.  In other words, the four criteria identified in 42

C.F.R. § 413.89(e) must still be satisfied before a provider is entitled to reimbursement for bad

debt, including bad debt older than 120 days and still at a collection agency.  Thus, "the provider

must first determine that the debt is 'uncollectible' by which it must exhaust what it has

established as its reasonable and customary collection efforts," and, "[i]f a provider chooses to

utilize a collection agency, these efforts must be exhausted before the debt can be determined to

be uncollectable and, therefore, worthless."  *Id.*

---

[10] As noted, the 2002 Intermediary letter to the CHS plaintiffs does not describe the practices of the Intermediary or the plaintiffs fifteen years earlier, before the Moratorium took effect, regarding reimbursement of Medicare bad debt pending at collection agencies.  *See* AR 2052–53.

In reaching this conclusion, the PRRB focused on the structure and text of PRM § 310.2, which states, in full that "[i]f after reasonable and customary attempts to collect a bill, the debt remains unpaid more than 120 days from the date the first bill is mailed to the beneficiary, the debt may be deemed uncollectible." *Id.* at 9.  The PRRB determined that the prepositional phrase "[i]f after reasonable *and* customary attempts to collect a bill," means that "reasonable and customary attempts to collect a bill" must occur regardless of the time elapsed since a bill is first mailed. *Id.* at 20 (emphasis in original).  Otherwise, the words "remained unpaid more than" would be rendered superfluous, since any other reading would mean that the debt could be "deemed uncollectible" after 120 days *regardless* of whether the provider had completed its reasonable and customary attempts to collect. *Id.*  Thus, the PRRB opined that the presumption of noncollectibility applies "only if (1) the provider has completed its customary collection attempts for that debt; (2) the actual collection attempts for the bad debt being claimed are 'reasonable'; and (3) the collection attempts for the debt are completed more than 120 days from the date the first bill [was] sent to the patient for that debt." *Id.*

Based on this construction of the regulatory provision, the PRRB concluded that "the policy of not allowing providers to claim bad debts until they are returned from a collection agency is consistent with the Regulations and Manual sections in effect on August 1, 1987." *Id.* Accordingly, the PRRB found that the disallowance of the plaintiffs' reimbursement requests was not a violation of the Moratorium's first prong, and upheld the Intermediaries' decisions. *Id.* at 26.  The PRRB's holding was narrow, ruling only that the Intermediaries "properly disallowed the [plaintiffs'] claimed Medicare bad debts solely on the ground that accounts related to such bad debts were still pending at outside collection agencies." *Id.*  The CMS Administrator declined to review the decision of the PRRB. *Id.* at 1.

The plaintiffs timely filed this lawsuit, pursuant to the APA and the judicial review of Medicare decisions provision in 42 U.S.C. § 1395oo, challenging the PRRB's decision as "inconsistent with and unauthorized by the governing Medicare statute, regulations, and manual provisions, [] arbitrary and capricious, [] not supported by evidence in the record, and violat[ive of] the APA and the Medicare program's publication requirements."  FAC ¶ 38.

## II.   LEGAL STANDARD

### A.   Summary Judgment Standard Under Federal Rule of Civil Procedure 56

Pursuant to Federal Rule of Civil Procedure 56, summary judgment may be granted when the court finds, based upon the pleadings, depositions, affidavits, and other factual materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a), (c); *see Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).  "A genuine issue of material fact exists if the evidence, 'viewed in a light most favorable to the nonmoving party,' could support a reasonable jury's verdict for the non-moving party."  *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 215 (D.C. Cir. 2013) (quoting *McCready v. Nicholson,* 465 F.3d 1, 7 (D.C. Cir. 2006)).

In APA cases such as this one, involving cross-motions for summary judgment, "the district judge sits as an appellate tribunal.  The 'entire case' on review is a question of law."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (collecting cases).  Thus, this Court need not and ought not engage in lengthy fact finding, since "[g]enerally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions."  *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996); *see also Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 171 (D.C. Cir. 2013) (noting, in APA case, that

"determining the facts is generally the agency's responsibility, not ours"); *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) ("Under the APA . . . the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.") (quotation marks and citation omitted)). Judicial review is limited to the administrative record, since "[i]t is black-letter administrative law that in an APA case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision." *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (internal citations and quotation marks omitted; alteration in original); *see* 5 U.S.C. § 706 ("[T]he Court shall review the whole record or those parts of it cited by a party . . . ."); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (noting when applying arbitrary and capricious standard under the APA, "'[t]he focal point for judicial review should be the administrative record already in existence . . . .'" (quoting *Camp v. Pitts,* 411 U.S. 138, 142 (1973)).

### B.        Standards of Review Under Administrative Procedure Act

#### 1.        Chevron *Deference*

The familiar two-step process set out in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* (*Chevron*), 467 U.S. 837, 845 (1984), applies to judicial review of claims that an agency has acted "in excess of statutory jurisdiction, authority or limitations, or short of statutory right" under the APA, when the agency is interpreting a statute. *See Am. Fed'n of Gov't Emps. Local 3669 v. Shinseki*, 709 F.3d 29, 33 (D.C. Cir. 2013). At the first step of the inquiry, a court must "ask whether Congress has directly addressed the precise question at issue." *Mayo Found. for Med. Educ. & Research v. United States,* 131 S. Ct. 704, 711 (2011) (internal citations omitted). "'If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'"

*City of Arlington, Tex. v. FCC,* 133 S. Ct. 1863, 1868 (2013) (quoting *Chevron*, 467 U.S. at 842–43).

On the other hand, if "Congress has not directly addressed the precise [interpretative] question at issue . . . the agency is charged with filling the 'gap left open' by the ambiguity." *EPA v. EME Homer City Generation, L.P.* (*EME Homer*), 134 S. Ct. 1584, 1603 (2014) (quoting *Chevron*, 467 U.S. at 843, 866) (first alteration in original).  Thus, if the statute is silent or ambiguous with respect to the specific issue under consideration, the analysis shifts to *Chevron* step two, where "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *City of Arlington, Tex.,* 133 S. Ct. at 1868; *see CSX Transp., Inc. v. Surface Transp. Bd.*, 754 F.3d 1056, 1063 (D.C. Cir. 2014) (same).

When Congress has delegated to the agency authority to make rules carrying the force of law, and the challenged agency interpretation was promulgated in the exercise of that authority, then the agency's rule is entitled to deference "as long as it is a permissible construction of the statute, even if it differs from how the court would have interpreted the statute in the absence of an agency regulation." *Sebelius v. Auburn Reg'l Med. Ctr.,* 133 S. Ct. 817, 826 (2013); *see also EME Homer*, 134 S. Ct. at 1606 (determining if agency's interpretation of ambiguous phrase is "permissible construction of statute" as second step of *Chevron* analysis); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 980 (2005) ("If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.").  Courts "routinely accord dispositive effect to an agency's reasonable interpretation of ambiguous statutory language." *EME Homer*, 134 S. Ct. at 1603 (citation omitted).  "Deference is appropriate even if

the agency's interpretation first appears during litigation, unless the interpretation conflicts with prior interpretations or amounts to nothing more than a convenient litigating position." *Shieldalloy Metallurgical Corp. v. Nuclear Regulatory Comm'n*, 768 F.3d 1205, 1208–09 (D.C. Cir. 2014) (internal quotation marks and citations omitted).  A court "need not conclude that the [agency's] interpretation of the [s]tatute is the only one it permissibly could have adopted or even the interpretation deemed *most* reasonable by the courts," so long as it is reasonable.  *Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth.*, 754 F.3d 1031, 1042 (D.C. Cir. 2014) (internal quotation marks and citations omitted; emphasis in original).[11]

### 2.    Auer *Deference*

An agency's interpretation of its own regulations commands substantial judicial deference.  *See Auer v. Robbins*, 519 U.S. 452, 463 (1997); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 415–17 (1945); *Drake v. F.A.A.*, 291 F.3d 59, 68 (D.C. Cir. 2002).  "When an agency interprets its own regulation, the Court, as a general rule, defers to it 'unless that interpretation is 'plainly erroneous or inconsistent with the regulation.'"  *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1337 (2013) (quoting *Chase Bank USA, N. A. v. McCoy*, 562 U.S. 195, 208 (2011)); *see also Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (holding that agency's interpretation controls unless it is plainly erroneous or inconsistent with the regulation); *Seminole Rock*, 325 U.S. at 414 (noting that a regulation "becomes . . . controlling weight unless it is plainly erroneous or inconsistent with the regulation."); *Huerta v.*

---

[11] The Supreme Court recently articulated an exception to *Chevron* that applies in "extraordinary cases" where "there may be reason to hesitate before concluding that Congress has intended such an implicit delegation" of authority to an agency.  *King v. Burwell*, No. 14-114, 2015 WL 2473448, at *8 (U.S. June 25, 2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).  In cases involving questions "of deep 'economic and political significance' that is central to [a] statutory scheme," *id.* (quoting *Util. Air. Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2444 (2014)), courts may set aside *Chevron* deference and instead look directly to the statutory text, examined in light of its "context and with a view to [its] place in the overall statutory scheme," *id.* (quoting *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133).

*Ducote*, No. 14-1023, 2015 WL 3952264, at *6 (D.C. Cir. June 30, 2015) ("To the extent the

agency has interpreted its own . . . regulation, that interpretation is to be accorded deference . . .

unless it is clearly contrary to the plain and sensible meaning of the regulation." (internal

quotation marks omitted; second alteration in original)); *Texas v. EPA*, 726 F.3d 180, 194 (D.C.

Cir. 2013) (finding agency interpretation of its regulation is "controlling because the

interpretation is neither plainly erroneous [n]or inconsistent with the regulation, and there is no

reason to suspect that it does not reflect the agency's fair and considered judgment on the matter

in question") (internal quotations and citations omitted; brackets in original).

Thus, a plaintiff challenging an agency's interpretation of its own regulations carries a

"heavy burden in advancing [that] claim" because an "agency's interpretation of its own

regulations 'must be given controlling weight unless it is plainly erroneous.'" *In re Polar Bear

Endangered Species Act Listing & Section 4(d) Rule Litig. — MDL  No. 1993* (*In re Polar Bear

Litig.*), 709 F.3d 1, 11 (D.C. Cir. 2013) (internal citations omitted); *see Auer*, 519 U.S. at 461–

62; *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) ("[W]e must defer to the

[agency]'s interpretation unless an 'alternative reading is compelled by the regulation's plain

language or by other indications of the Secretary's intent at the time of the regulation's

promulgation."). "Although an agency is 'entitled to significant deference in interpreting its own

regulation—perhaps even more than an agency gets in interpreting a statute under *Chevron*'—it

is unlikely we would defer to an unreasonable agency interpretation of an ambiguous

regulation.'" *Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 343 (D.C. Cir. 2011)

(Brown, J. dissenting in part) (quoting *Kidd Commc'ns v. FCC*, 427 F.3d 1, 4 (D.C. Cir. 2005)).

### 3.    *Substantial Evidence*

When an agency's adjudicatory decision is challenged under the APA, such adjudications

are overturned only upon a finding that the "agency action, findings, and conclusions" are

"unsupported by substantial evidence . . . on the record of an agency hearing."  5 U.S.C. §

706(2)(E); *see Kaufman v. Perez*, 745 F.3d 521, 527 (D.C. Cir. 2014) (noting that agency factual

findings may be "set aside . . . 'only if unsupported by substantial evidence on the record as a

whole.'" (quoting *Chippewa Dialysis Servs. v. Leavitt*, 511 F.3d 172, 176 (D.C. Cir. 2007));

*Dillmon v. NTSB*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (noting that agency's factual findings

may be adopted "as conclusive if supported by substantial evidence . . . even though a plausible

alternative interpretation of the evidence would support a contrary view" (internal citation and

quotation marks omitted)).

Notably, "an agency's refusal to consider evidence bearing on the issue before it

constitutes arbitrary agency action within the meaning of § 706," as does ignoring "evidence

contradicting its position."  *Butte Cnty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).  As

the D.C. Circuit has explained, an agency decision "would be arbitrary and capricious" if is not

"supported by substantial evidence" because "'it is impossible to conceive of a 'nonarbitrary'

factual judgment supported only by evidence that is not substantial in the APA sense.'"  *Safe*

*Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007) (quoting *Ass'n of Data Processing*

*Serv. Org. v. Bd. of Governors of Fed. Reserve Sys.* (*ADPSO*), 745 F.2d 677, 684 (D.C. Cir.

1984)).  Consequently, when assessing whether agency action is arbitrary or capricious, "in their

application to the requirement of factual support[,] the substantial evidence test and the arbitrary

or capricious test are one and the same."  *ADPSO*, 745 F.2d at 683; *accord CTS Corp.*, 759 F.3d

at 59 n.1.

The scope of review under the "arbitrary and capricious standard is 'highly deferential,'"

*Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 245 (D.C. Cir.

2013) (quoting *Am. Wildlands v. Kempthorne,* 530 F.3d 991, 997 (D.C. Cir. 2008)); *Envtl. Def.*

21

*Fund, Inc. v. Costle,* 657 F.2d 275, 283 (D.C. Cir. 1981) (same), and "narrow," such that "a court is not to substitute its judgment for that of the agency," *Judulang v. Holder*, 132 S. Ct. 476, 483 (2011); *see also Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1135 (D.C. Cir. 2014) (same); *Agape Church, Inc. v. FCC*, 738 F.3d 397, 408 (D.C. Cir. 2013) (same).  Particularly when "an agency has acted in an area in which it has 'special expertise,' the court must be particularly deferential to [the agency's] determinations." *Sara Lee Corp. v. Am. Bakers Ass'n Ret. Plan,* 512 F. Supp. 2d 32, 37 (D.D.C. 2007) (quoting *Bldg. & Constr. Trades Dep't, AFL–CIO v. Brock,* 838 F.2d 1258, 1266 (D.C. Cir. 1988)).  Yet, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." *Judulang*, 132 S. Ct. at 483–484. Simply put, "the agency must explain why it decided to act as it did." *Butte Cnty.*, 613 F.3d at 194.

In evaluating agency actions under the "arbitrary and capricious" standard, courts "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Ore. Natural Res. Council,* 490 U.S. 360, 378 (1989) (citation and internal quotation marks omitted); *Citizens to Preserve Overton Park, Inc. v. Volpe* (*Overton Park*)*,* 401 U.S. 402, 416 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977); *Blue Ridge Envtl. Def. League v. Nuclear Regulatory Comm'n*, 716 F.3d 183, 195 (D.C. Cir. 2013).  When an agency "'fail[s] to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action.'" *Cnty. of Los Angeles v. Shalala,* 192 F.3d 1005, 1021 (D.C. Cir. 1999) (quoting *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1222 (D.C. Cir. 1999)); *see Select Specialty Hosp.-Bloomington, Inc. v. Burwell*, 757 F.3d 308, 312 (D.C. Cir. 2014) (noting that when "'an agency's failure to state its reasoning or to adopt an intelligible decisional standard is [] glaring []

we can declare with confidence that the agency action was arbitrary and capricious'" (quoting *Checkosky v. SEC*, 23 F.3d 452, 463 (D.C. Cir. 1994))).  At the very least, the agency must have reviewed relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made."  *See Am. Trucking Ass'ns, Inc.*, 724 F.3d at 249 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* (*State Farm*), 463 U.S. 29, 43 (1983)); *see also EME Homer*, 134 S. Ct. at 1602 (holding that agency "retained discretion to alter its course [under a regulation] provided it gave a reasonable explanation for doing so"); *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[A] fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." (internal quotation marks and citation omitted)).  "[C]onclusory statements will not do; an agency's statement must be one of *reasoning*."  *Amerijet Int'l Inc.*, 753 F.3d at 1350 (internal quotation marks omitted; emphasis in original).

## III.    DISCUSSION

The plaintiffs challenge the PRRB decision on multiple grounds, arguing that the HHS policy underlying this decision of not reimbursing Medicare bad debt retained by collection agencies is (1) inconsistent with the plain language of the applicable regulation; (2) violative of the Medicare Bad Debt Moratorium; and (3) issued without appropriate notice-and-comment rulemaking or fair notice to the plaintiffs.  For the reasons detailed below, the Court concludes that the defendant's interpretation of its regulations is reasonable and in accord with the Moratorium and the requirements of the APA.  Consequently, the challenged decision must be upheld.

**A.      The Agency's Interpretation Of The Applicable Regulation Is Reasonable**

The rationale supporting the HHS policy disallowing reimbursement of Medicare bad debt retained by collection agencies is explicated at length in the challenged PRRB decision.  *See* AR at 6–31.  The PRRB found that the agency's policy is reasonably dictated by both the criteria set out in the relevant regulation, 42 C.F.R. § 413.89(e), and the presumption of noncollectibility in PRM § 310.2.  *Id.*  In short, to be reimbursed for bad debt, a provider must meet each of the four criteria set forth in 42 C.F.R. § 413.89(e), regardless of how long the bill is overdue and unpaid.  AR at 15–16.  Moreover, a provider seeking reimbursement of bad debt pending at a collection agency cannot satisfy all four criteria, rendering the bad debt in question non-reimbursable.  *Id.*

In particular, the PRRB concluded, reasonably, that if a provider sends a debt to a collection agency, and that debt remains in active collection at the agency, the debt cannot be "worthless," within the meaning of the third criterion, under 42 C.F.R. § 413.89(e)(3).  AR at 20.  The PRRB also concluded that a debt pending at a collection agency cannot satisfy the fourth criterion, under 42 C.F.R. § 413.89(e)(4), that there is "no likelihood of recovery at any time in the future," since the provider exercised "sound business judgment" to send the debt to a collection agency in the first instance, rather than write-off the debt.  *See* AR at 18–20.  The provider must believe in *some* likelihood of recovery, and that the debt is not "worthless," if the provider's sound business judgment requires the submission of a debt to a collection agency rather than ceasing all efforts to collect the debt.  *See id.*  Consequently, though a provider is not required to send debts to a collection agency to demonstrate "reasonable collection efforts" for the purposes of 42 U.S.C. § 413.89(e)(2), *see* AR 371 (PRM § 310.A) ("A provider's collection effort may include the use of a collection agency . . ."), choosing to do so means that the third

and fourth criteria cannot be met until the collection agency ceases efforts to collect on the debt, AR at 20.  Only at that time can the debt be considered "worthless" and as having "no likelihood of recovery at any time in the future," when all collection efforts have unsuccessfully concluded.  *See id.*

PRM § 310.2, the presumption of noncollectibility, is easily reconciled with the regulatory criteria in 42 C.F.R. § 413.89(e) for reimbursable Medicare bad debt.  The presumption of noncollectibility clarifies that "after reasonable and customary attempts to collect a bill" a "debt may be deemed uncollectible" if it "remains unpaid more than 120 days from the date the first bill is mailed to the beneficiary."  AR at 373. (PRM § 310.2).  The PRRB concluded that PRM § 310.2 interprets 42 C.F.R. § 413.89(e)(3), under which a provider must show that the bad debt at issue "was actually uncollectible when claimed as worthless."  AR at 20.  If the presumption applies, a provider satisfies the third criterion for reimbursement after 120 days have elapsed without other evidence of the debt's uncollectible status.  *Id.*  The presumption does not, however, "excuse a provider from satisfying the other criteria specified" in the regulation, including that there is "no likelihood of recovery at any time in the future," as defined by the "sound business judgment" of the provider.  *Id.*; *see* 42 C.F.R. § 413.89(e)(4).  The PRRB reasoned that a provider turns a debt over to a collection agency based upon a belief in *some* likelihood of recovery and, so long as the collection agency is allowed to pursue the account, the provider is therefore unable to meet all four criteria for reimbursement, regardless of whether the presumption of noncollectibility would otherwise apply.  *See* AR at 20–21; *Lakeland Reg'l Health Sys. v. Sebelius* (*Lakeland*), 958 F. Supp. 2d 1, 7 (D.D.C. 2013).[12]

---

[12] The plaintiffs contend that PRM § 310.2 refers only to "the *pursuit* of 'reasonable and customary' collection efforts," and that those efforts need not be completed to trigger the application of the presumption of noncollectibility. Pls.' Mem. at 17–18 (emphasis in original).  The plaintiffs urge the adoption of this proposed reading because, according to the plaintiffs, PRM § 310.2 "was intended to set up a bright-line rule as to when a

The PRRB's determination that the presumption of noncollectibility is discretionary and does not trump the provider's obligation to meet the four criteria of 42 C.F.R. § 413.89(e), is consistent with the only pre-Moratorium PRRB decision "that considered the presumption of noncollectibility."  AR at 20 n.54 (citing *Davie County Hospital v. Blue Cross Blue Shield Association* (*Davie County*), PRRB Dec. No. 1984-D89 (Mar. 22, 1984)).  In *Davie County*, the PRRB upheld an intermediary's disallowance of a bad debt reimbursement even though, for the debts at issue, more than six months had elapsed since the first bill had been sent to the patient. *Id.*  The provider admitted to sending non-Medicare debts to a collection agency but did not do the same for Medicare debts.  *Id.*  The PRRB held that the provider's collection efforts were not "reasonable" since the provider did not engage in collection efforts that were equivalent to the collection agency's efforts to collect non-Medicare debt, even though the Medicare debts had been pending for longer than 120 days.  *Davie County*, PRRB Dec. No. 1984-D89.  Specifically, the PRRB found that the provider could have used "other in-house collection efforts, such as writing letters and making telephone calls" that could have rendered the provider's in-house efforts similar to those engaged in by the collection agency that handled non-Medicare accounts. *Id.*  The provider failed to do so, making its treatment of Medicare and non-Medicare accounts sufficiently different so as to justify the disallowance of reimbursement, regardless of the length of time the Medicare debt remained unpaid.  *Id.*

---

provider could deem the debt uncollectible and not have to provide fact evidence of its uncollectibility."  The plaintiffs' contention is misguided for two reasons.  First, in an APA challenge, the Court's role is not to determine the "more natural and logical reading" of an agency's interpretation of a regulation, Pls.' Mem. at 17, but rather to determine whether the agency's interpretation is "plainly erroneous or inconsistent with the regulation."  *Decker*, 133 S. Ct. at 1337.  The agency's interpretation here is neither plainly erroneous nor inconsistent with the regulation.  Second, if the plaintiffs are correct that PRM § 310.2 was intended to create "a bright-line rule," the agency's interpretation—that the presumption of noncollectibility may apply only when collection efforts have ceased—establishes a clearer bright-line than the plaintiffs' proposed reading.  Under the plaintiffs' interpretation, Intermediaries would have to determine whether reasonable and customary efforts were being "pursued," a dynamic notion, while the agency's interpretation merely asks whether collection efforts, both in-house and at collection agencies, have ceased.

The plaintiffs dispute the reasonableness of the PRRB's interpretation of the regulation on both textual and policy grounds. First, the plaintiffs contend that the agency's interpretation of the third criterion in 42 C.F.R. § 413.89(e)(3), which requires establishment that "[t]he debt was actually uncollectible when claimed as worthless," has a "fundamental flaw" due to "over-simplification." Pls.' Reply Def.'s Opp'n Pls.' Mot. ("Pls.' Reply") at 15, ECF No. 21. Under the agency's interpretation of the third criterion, "a provider that continues to attempt collection of a beneficiary's debt, either through in-house efforts or through a collection agency account cannot have been determined to be uncollectible or worthless if a provider believes it has sufficient worth for referral to a collection agency." Def.'s Mem. at 12. According to the plaintiffs, this interpretation "fails to distinguish between the individual provider's determination of whether or not an account is collectible and the separate and independent determination of a collection agency." Pls.' Reply at 15.

Essentially, the plaintiffs are critical of applying the third criterion in a holistic fashion to the collection process *in toto* and, instead, urge that this criterion focus solely on in-house efforts and ignore the efforts of collection agencies. *See id.* The "upshot" is that the plaintiffs believe a provider's decision to refer an account to the collection agency, standing alone, is all that is required to satisfy 42 C.F.R. § 413.89(e)(3), and the evaluation by a collection agency "whether the account has worth *to the collections agency*," is irrelevant to meeting this criterion. Pls.' Reply at 17 (emphasis in original). The plaintiffs' logic is, at best, tenuous. If a provider believes that a debt is "actually uncollectible" and "worthless," under the third criterion, sound business judgment would presumably counsel against engaging in the useless exercise of referring that debt to a collection agency and incurring concomitant service charges. As the *Lakeland* court pointed out, "what provider exercising sound business judgment would spend his

precious resources on the fool's errand of pursuing an uncollectible debt with no likelihood of future recovery?" 958 F. Supp. 2d at 7. On the contrary, this analysis supports the agency's interpretation of 42 C.F.R. § 413.89(e)(3) and (4): sound business judgment requires that a debt have *some* likelihood of future recovery to send the debt to a collection agency—otherwise, sending the debt to a collection agency is, as the *Lakeland* court observed, a "fool's errand." *Id.* Thus, the agency's interpretation of the regulation to mean that sending a debt to a collection agency disqualifies that debt from reimbursement so long as the provider persists in that referral, is reasonable and, until all collection efforts have ceased, the debt is not "worthless" under 42 C.F.R. § 413.89(e)(3).

Next, the plaintiffs argue that agency's interpretation of the fourth criterion in 42 C.F.R. § 413.89(e)(4), requiring "[s]ound business judgment established that there was no likelihood of recovery at any time in the future," effectively re-writes "the regulation's requirement that there be no '*likelihood*' of recovery with a requirement that there be no '*possibility*' of recovery." Pls.' Mem. at 27 (emphasis in original). In the plaintiffs' view, "it can hardly be considered *likely*, or *probable*, that a patient who has made no payments on an account for more than 120 days . . . will end up making payment on his/her debt." *Id.* (emphasis in original). The plaintiffs are correct that the agency construes the phrase of "no likelihood of recovery" in the fourth criterion of the regulation as amounting to no possibility of recovery. *See* Def.'s Mem. at 14 n.4 (agreeing that "this is precisely how the Secretary interprets this provision"). Given the emphasis in the regulation that the bad debt be likely unrecoverable "at any time in the future," 42 C.F.R. § 413.89(e)(3), and that this debt be "actually uncollectible" and "worthless," 42 C.F.R. § 413.89(e)(3), the agency's interpretation that "no likelihood" is contextually equivalent to "no possibility," is reasonable.

By contrast, adoption of the plaintiffs' interpretation would effectively rewrite the regulation to eliminate the third and fourth criteria. If, as the plaintiffs urge, the presumption of noncollectibility is absolute and, after 120 days of collection efforts, a debt automatically becomes reimbursable, the regulatory criteria that a debt be "actually uncollectible," "worthless," and have "no likelihood of recovery at any time in the future" would become nullities. *See* 42 C.F.R. § 413.89(e). This proposition echoes the finding the Sixth Circuit made in *Battle Creek Health System v. Leavitt* (*Battle Creek*), 498 F.3d 401, 411–12 (6th Cir. 2007). In that case, the court held that the Secretary's interpretations of "§ 413.89(e) [was] eminently reasonable" and of PRM § 310.2 "is consistent with, and most effectively enforces, all of the criteria" of the regulation. *Id*. The plaintiffs' alternative view that the presumption of noncollectibility applies regardless of a debt's status at a collection agency, would render "the third and fourth criteria of 42 C.F.R. § 413.89(e) . . . nugatory." *Id.* at 411.[13]

Finally, the plaintiffs challenge the agency's interpretation as "unreasonable" on policy grounds, contending that this interpretation of the criteria for Medicare bad debt reimbursement in 42 C.F.R. § 413.89(e) "actually financially harms Medicare as well." Pls.' Reply at 18. The plaintiffs reason that debts pending at a collection agency may eventually be collected, with any collected amounts returned to Medicare, pursuant to PRM § 316. *Id.* "[B]y prohibiting a collection agency from continuing to hold and monitor an account already paid by CMS, the agency is foregoing possible recoupments of monies already paid out." *Id.* This argument actually cuts against the plaintiffs' position that Medicare bad debts active at collection agencies meet the requirements of 42 C.F.R. § 413.89(e). The only way Medicare could be harmed by

---

[13] The *Battle Creek* court did not address the effect of the Moratorium on the agency's interpretation. *See generally Battle Creek*.

failing to allow efforts at a collection agency to continue after reimbursement is if the debt

actually had some likelihood of being recovered, in which circumstance the debt should not have

been reimbursed in the first instance.  Construing the regulatory criteria as the plaintiffs'

suggest—and permitting reimbursement to a provider upon referral of Medicare debt to a

collection agency—would invite premature reimbursement and essentially absolve the plaintiffs

from complying with 42 C.F.R. § 413.89(e)(4), since the plaintiffs would not, presumably, send

to a collection agency any debt that the plaintiffs believed had "no likelihood of recovery at any

time in the future."  *See Lakeland*, 958 F. Supp. 2d at 7.  Thus, the plaintiffs' policy argument,

predicated on the rationale that debt pending at a collection agency retains some value and has

some likelihood of recovery, is not persuasive.  The agency's interpretation of 42 C.F.R. §

413.89(e), in contrast, gives effect to all four criteria in 42 C.F.R. § 413.89(e).

 This Court joins the other courts to have considered this issue and finds that the agency's

policy is a reasonable interpretation of 42 C.F.R. § 413.89.  *See Battle Creek*, 498 F.3d at 412;

*Lakeland*, 958 F. Supp. 2d at 8–9; *Mesquite Cmty. Hosp. v. Levitt*, No. 3-07-CV-1093, 2008 WL

4148970, at *4 (N.D. Tex. Sept. 5, 2008).  Moreover, the PRRB's application of that policy in

the challenged decision to the plaintiffs' bad debt reimbursement is not, standing alone, arbitrary

and capricious.  This finding is highly probative, but not determinative, of how long the agency's

policy has been in effect.  The Court turns next to the question whether the agency's bad debt

reimbursement policy was in existence at the time the Moratorium took effect and the plaintiffs'

claim that the policy violates the Moratorium.

###  B. The Agency's Interpretation Does Not Violate The Moratorium

 As previously noted, the text and legislative history for the Moratorium and its

amendments make no explicit reference to the agency's specific policy disallowing

reimbursement of Medicare bad debt accounts pending at collection agencies.  The Moratorium

merely bars any change in agency policy regarding bad debt reimbursement generally.  Thus, the

Moratorium itself sheds no light on the critical question whether the agency applied a policy in

the challenged PRRB decision that was in effect in August 1987 or, as the plaintiffs assert,

violated the statutory command in the Moratorium.

The language of the Moratorium conditions a violation on a change in HHS "policy."

*See* 42 U.S.C. § 1395f note.  The 1988 Conference Report clarified that the "policy" was defined

by HHS' regulations, manuals, and issuances as well as PRRB decisions.  H.R. Rep. No. 100-

1104, at 25.  The bad debt reimbursement regulations, of which 42 U.S.C. § 413.89 is the most

relevant here, are part of the agency's efforts to give effect to the statutory prohibition on cross-

subsidization in 42 U.S.C. § 1395x(v)(1)(A)(i).  Thus, in prohibiting a change in "the policy" of

HHS regarding bad debt reimbursement, the Moratorium froze the agency's implementing

regulations for this aspect of the Medicare program.  As such, the question at issue can best be

understood as determining the meaning of the relevant HHS regulations when the Moratorium

took effect.  In this context, the agency's interpretation of its own regulation must be deferred to

"unless an 'alternative reading is compelled by the regulation's plain language or by other

indications of the Secretary's intent at the time of the regulation's promulgation.'"  *Thomas*

*Jefferson Univ.*, 512 U.S. at 512 (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)).

This interpretive problem is complicated by the relative dearth of pre-Moratorium agency

decisions or specific written policy statements articulating exactly what the agency's policy was

regarding reimbursement of Medicare bad debt pending at collection agencies.  *See* Pls.' Mem. at

13 (noting that "[t]here are no agency statements prior to August 1, 1987 expressing a policy that

patient accounts pending at a collection agency are presumed to be collectible and therefore

cannot be reimbursed as Medicare bad debt").  The reason for the lack of such evidence, prior to

August 1, 1987, may be attributable to the fact that, for cost years prior to January 1, 1983,

providers were prohibited by regulation from using legal action or the "threat of legal action to

collect Medicare deductible and coinsurance amounts."  AR at 23 n. 65.  Since using threats of

legal action is a tactic often associated with collection agencies, providers may have turned with

more regularity to use of such agencies as part of the effort to recoup Medicare bad debt

beginning only after the regulatory change in 1983.  *See* AR at 23 n.65; *Davie County* (listing

"maintain[ing] full control" over collection processes to avoid running afoul of prohibition on

"using or threatening to use court action to collect overdue amounts from Medicare patients"

among provider's reasons for failing to use collection agency).  The substantial time lag between

the providers' submission of bad debt information for reimbursement and a PRRB ruling on an

intermediary's decision would likely have pushed any focus on this specific policy until much

later.  Indeed, the PRRB ruling in this matter issued in 2014 refers to the cost years of 2004,

2005, and 2006.  AR at 10.  A combination of the change permitting use of collection tactics

associated with collection agencies in 1983 and the delay between reimbursement disallowances

and resolution, allows, at best, only a short period before the Moratorium became effective in

August 1987 for this precise issue to have reached the PRRB or CMS Administrator for a clear

articulation of the policy against reimbursement of Medicare bad debt pending at collection

agencies.

        Nevertheless, substantial evidence exists in the record to support the conclusion that the

agency's policy pre-dates the Moratorium.  The primary evidence for this conclusion is the fact

that the relevant regulation, 42 C.F.R. § 413.89(e), and the interpretive guidance in PRM § 310,

existed in their present forms prior to the Moratorium taking effect.  *See* Def.'s Mem. at 31 n.15

(noting 42 C.F.R. § 413.89 was finalized in 1966); AR at 16 n.44 (noting last substantive

revision to PRM § 310 in January 1983).  Consequently, the relevant regulation and guidance fall

into the existing "PRRB . . . manuals and issuances" category, which the 1988 conferees made

clear the Moratorium was not intended to disturb.  *See* H.R. Rep. No. 100-1104, at 25.  The

plaintiffs dismiss reliance on the agency's reasonable interpretation of this regulation and

guidance as a source of the policy in effect at the time of the Moratorium, arguing that this

amounts to an assertion that the disallowance of reimbursement for Medicare bad debt pending at

collection agencies is "inherent in the bad debt regulations themselves" and merely conflates the

agency's current interpretation with its pre-Moratorium interpretation.  Pls.' Mem. at 13-14

(citing *District Hosp. Partners L.P. v. Sebelius* (*District*), 932 F. Supp. 2d 194, 200-201 (D.D.C.

2013); *see also Foothill Hosp. v. Leavitt*, 558 F. Supp. 2d 1, 10 (*Foothill*) (D.D.C. 2008)).

Contrary to the plaintiffs' view, this Court finds that the agency's interpretation of a long-

standing regulation to be no less reasonable because its current interpretation is the same as it

would have given, if asked, prior to the effective date of the Moratorium.

Furthermore, shortly after the Moratorium initially took effect and virtually

simultaneously with passage of the third amendment to the Moratorium, HHS revised, in

September 1989, the Medicare Intermediary Manual ("MIM"), which "updated [and] clarified"

aspects of Medicare policy.  AR at 392.  Among the revisions made by this 1989 version of the

MIM is the inclusion of an express statement that "[i]f the [bad] debt is written-off on the

provider's books 120 days after the date of the bill and then turned over to a collection agency,

the amount cannot be claimed as a bad debt on the date of the write-off.  It can be claimed as a

bad debt only after the collection agency completes its customary collection efforts."  AR at

402–03.  The defendant explains that the policy reflected in this MIM statement "was not new

when it was published in the MIM in 1989" but "[r]ather, at that time some Medicare contractors were incorrectly applying CMS policy and the agency issued the MIM to clarify the Secretary's bad debt policy and ensure it was being consistently applied."  Def.'s Mem. at 22.  This evidence, in combination with the reasonableness of the agency's interpretation of its own regulation and the level of deference due to that interpretation, supports the conclusion that the agency's policy regarding bad debt reimbursement was the same on August 1, 1987 as it is now.

The Court is mindful that three other Judges of this Court have considered this same question and reached different results.  *See Lakeland*, 958 F. Supp. 2d at 3; *District*, 932 F. Supp. 2d at 196; *Foothill*, 558 F. Supp. 2d at 9.  The *District* and *Foothill* courts held that the Secretary's policy disallowing reimbursement for bad debt pending at a collection agency violated the Moratorium, and as a result never addressed the reasonableness of the agency's interpretation or whether its "eminently reasonable," *Battle Creek*, 498 F.3d at 411, reading of its own regulations militated in favor of the policy's existence before the Moratorium took effect. *District*, 932 F. Supp. 2d at 206; *Foothill*, 558 F. Supp. 2d at 11.  In contrast, the *Lakeland* court held that this policy did not violate the Moratorium because "it has always been the Secretary's policy that accounts pending at collection agencies cannot be written off as bad debts until collection activity has terminated."  *Lakeland*, 958 F. Supp. 2d at 7.

Relying largely on the same evidence cited in *Foothill* and *District,* the plaintiffs urge this Court to follow the reasoning of those decisions.  *See generally* Pls.' Mem; Pls.' Reply.  As detailed below, however, examination of this evidence, including PRRB decisions both pre- and post-Moratorium, compels this Court to hold, as did the *Lakeland* court, that the reimbursement policy at issue is not a "change" from the Secretary's practices as of August 1, 1987 and, therefore, does not violate the Moratorium.

### 1.    *Pre-Moratorium Evidence*

The plaintiffs rely on three disparate pieces of evidence that pre-date the August 1, 1987 effective date of the Moratorium: (1) one Administrator's decision issued in 1984, Pls.' Mem. at 18; (2) the 1985 version of Medicare's Hospital Audit Program manual, *id.* at 15; and (3) the 1985 version of the MIM, *id.* at 22. These pieces of evidence, considered alone or in combination, do not, as the plaintiffs contend, reflect a different policy than that applied in the challenged PRRB decision.

First, the plaintiffs rely on a 1984 Administrator's decision in *Scotland Memorial Hospital v. Blue Cross and Blue Shield Association* (*Scotland*), No. 84-D174 (Nov. 8, 1984).[14] *Scotland* involved a challenge to the disallowance of bad debt reimbursement for a hospital that sent its non-Medicare debt to a collection agency but not its Medicare debt. *Scotland* at 110– 111. In that decision, the Administrator held that the PRRB "reached a reasonable inference when it found that the provider's treatment of Medicare accounts was similar to the treatment of non-Medicare accounts," despite the failure to send Medicare accounts to collection agencies, based on the finding that the in-house efforts of the provider equated with the permissible efforts a collection agency would have undertaken. *Id.*

*Scotland* is inapposite for at least two reasons. First, the Medicare regulations in effect for the cost years at issue in that case prohibited the use of legal process or the threat of legal process to collect Medicare debt from patients, a ban that effectively discouraged the use of collection agencies for bad Medicare debt. *Id.*; *see also Davie County*. As discussed above, this prohibition on the threat of or actual use of legal process to collect bad debt from Medicare patients was not lifted until a regulatory change made in 1983. AR at 23 n.65. Thus, the

---

[14] The *Scotland* decision is Exhibit 5 to the plaintiffs' corrected Motion for Summary Judgment, ECF No. 15-1, and page number citations refer to the ECF page number in this docket entry.

*Scotland* decision stands for the proposition that the lack of identical treatment for Medicare and non-Medicare debt may be excused if the provider treats the debts as similarly as regulations permit. *Scotland* at 111. This holding has little relevance to the issues in this instant matter. Second, the provider in *Scotland* stands in an entirely different posture from the plaintiffs in the instant case: in *Scotland*, the issue was whether the provider's decision *not to send* Medicare debt to a collection agency barred reimbursement, and the Administrator determined that reimbursement was allowed when the regulations required differential treatment of Medicare and non-Medicare debt. By contrast, here, the issue is whether the plaintiffs' decisions *to send* Medicare debt to a collection agency bars reimbursement, when such referral is not required but triggers the requirement for equivalent treatment with non-Medicare debt and, consequently, has repercussions affecting the timing of reimbursement. Given the different regulatory requirements and factual posture in *Scotland*, this decision has only limited probative value in illuminating the pre-August 1987 policy on reimbursing providers for Medicare bad debt pending at collection agencies.

Next, the plaintiffs cite a provision in Medicare's Hospital Audit Program manual, in effect in 1985. Pls.' Mem. at 15; *see* AR at 23; *see also* AR at 410 (reproducing full text of Hospital Audit Program § 15.04). In particular, the plaintiffs point to the sub-paragraph (A) in § 15.04 of this manual requiring hospital auditors to "[r]eview provider contracts with the collection agency to determine that both Medicare and non-Medicare uncollectible amounts are handled in a similar manner."[15] The plaintiffs make the interpretative leap that this section is

---

[15] The Hospital Audit Program manual § 15.04 reads, in full, as follows:

15.04 Where a provider utilizes the services of a collection agency, the provider need not refer all uncollected patient charges to the agency, but may refer only uncollected charges above a specified minimum amount. If reasonable collection effort was applied, fees the collection agency

"significant" and "show[s] that the Secretary considered debts pending at a collection agency to be uncollectible (and therefore, reimbursable)." Pls.' Mem. at 15. This is a leap too far. When providers use collection agencies as part of their collection efforts, § 15.04.A simply provides audit guidance to evaluate whether the providers require collection agencies to treat Medicare and non-Medicare accounts similarly, directing the auditors' attention to ensure proper documentation for those collection efforts and for verification of any bad debts claimed. AR at 410. Furthermore, rather than considering any debt pending at a collection agency to be automatically reimbursable, as the plaintiffs suggest, § 15.04.B directs the auditor to ensure the collection agency has proper documentation "to substantiate the collection effort," including "copies of the agency's billing, follow-up letters and reports of telephone and personal contacts." *Id.* This documentation, and the audit scrutiny requirement, of collection agency files demonstrates that mere referral to a collection agency was not considered by HHS to be sufficient proof that a Medicare bad debt was "worthless" or "uncollectible" to satisfy the criteria set out in 42 C.F.R. § 413.89(e). [16] At the same time, despite the parties' straining to read the

---

charges the provider are recognized as an allowable administrative cost of the provider. To determine the acceptability of collection agency services, perform the following audit steps.

A. Review provider contracts with the collection agency to determine that both Medicare and non-Medicare uncollectible amounts are handled in a similar manner.

B. Determine that the patient's file is properly documented to substantiate the collection effort by reviewing the patient's file for copies of the agency's billing, follow-up letters and reports of telephone and personal contacts.

C. Determine that the bad debt amounts recovered by the collection agency are properly recorded by verifying that the full amount collected is credited to the patient's account and the collection fee is charged to administrative expense.

AR at 410.

[16] In the challenged decision, the PRRB addresses the 1985 Hospital Audit Program manual by focusing on the first paragraph of § 15.04, which permits recovery by the providers of fees charged by collection agency, to bolster its claim that this provision is consistent with the agency's policy in this matter. AR at 24. The PRRB opines that § 15.04 refers to reimbursements for collection agency charges when "uncollectible bad debts [are] *coming back from* the collection agency to the provider." *Id.* (emphasis in original). This conclusion, according to the PRRB, is

1985 Hospital Audit Program manual as supportive of their respective positions, this document is silent regarding whether Medicare bad debt pending at a collection agency is, by definition, ineligible for reimbursement under the relevant regulation.

Finally, the plaintiffs rely upon the silence in the 1985 Medicare Intermediary's Manual ("MIM") § 4118.2, Part E, regarding the reimbursibility of bad debt pending at a collection agency. Pls.' Mem. at 22–23. This silence is not surprising given the historical regulatory framework that, prior to the 1983 cost year, providers were discouraged from sending Medicare bad debts to collection agencies, a regulatory limitation lifted only two short cost years before issuance of the 1985 MIM. In other words, during this short period of time, the reimbursibility of Medicare bad debt pending at collection agencies likely had not been an issue arising with sufficient frequency to warrant attention in the MIM. *See supra.* Silence in the 1985 MIM § 4118.2 regarding the policy applied in the challenged PRRB decision does not suffice to show that the agency had no policy at all. Indeed, the Supreme Court, in a Medicare reimbursement case, rejected the contention that a court could "infer from [] silence the existence of a contrary policy because" the document in question "did not purport to be a comprehensive review of all conditions that might be placed" on the reimbursement procedures in effect. *Thomas Jefferson Univ.*, 512 U.S. at 516.

The plaintiffs bear the burden of overcoming the substantial deference due to an agency in interpreting its own regulation, and reliance on silence falls woefully short of proving that the

---

implicit in the structure of § 15.04, since the PRRB construes the reimbursable collection agency fees as fees for services performed by the collection agency in pursuit of the debt, which fees are only charged after a collection agency has ceased its efforts and returned the debt to the provider. *Id.* at 24. While the PRRB's interpretation may not be the only tenable reading of § 15.04, it is not unreasonable in context. In any event, the plaintiffs' attempt to use the brief reference in § 15.04.A to "Medicare and non-Medicare uncollectible amounts" as conclusive proof that all Medicare debts at collection agencies were reimbursable as bad debt in 1985, is not so clear from the Hospital Audit Program manual as to brook no other interpretation. *See* Pls.' Mem. at 15. At best, the plaintiffs have merely pointed out an alternative interpretation with no evidence that the agency ever endorsed and used that interpretation.

Secretary had a contrary policy to that expressed in this case prior to August 1, 1987.  Thus, the plaintiffs have provided no persuasive evidence pre-dating the August 1, 1987 Moratorium that the agency had a policy regarding the reimbursement of Medicare bad debt pending at a collection agency that is different from the agency's position expressed in the challenged PRRB decision.

### 2.    *Post-Moratorium Evidence*

The plaintiffs also rely on two other items generated by HHS components post-dating the effective date of the Moratorium to bolster their contention that the challenged PRRB decision applied a policy different from the policy in effect on August 1, 1987, in violation of the Moratorium.  Specifically, the plaintiffs rely upon (1) a 1995 Administrator decision, Pls.' Mem. at 14, 20–22; and (2) the transmittal memorandum for, and 1989 amendment to, the MIM, *id.* at 15, 24–25.[17]

First, the plaintiffs discuss extensively the 1995 Administrator's decision in *Lourdes Hospital v. Blue Cross and Blue Shield Association* (*Lourdes*), Case Nos. 95-D58, 95-D59, 95-D60 (H.C.F.A. Admin. Decis. Oct. 27, 1995), which is both distinguishable from the instant case and, to the extent the decision has been construed as the plaintiffs urge, expressly disavowed by the agency.  *See* Pls.' Mem. at 14, 20–23.  *Lourdes* involved an appeal to the CMS Administrator from an Intermediary's decision disallowing Medicare bad debts, which were written off fewer

---

[17] The parties debate the meaning and import of four additional post-Moratorium documents, including (1) a June 1990 HCFA memorandum, Pls.' Mem. at 24–25; Def.'s Mem. at 25–26; (2) a 1990 cover memorandum from an Intermediary discussing the June 1990 HCFA memorandum, Pls.' Mot. Ex. 2, ECF No. 15-1; Def.'s Mem. at 25; (3) a March 20, 1990 memorandum from an agency component regarding the "Clearance of Memorandum to Regional Offices on Bad Debts," Def.'s Mem. at 26 n.13; and (4) a 2008 Joint Signature Memorandum from CMS that "reiterated [the agency's] longstanding interpretation of 42 C.F.R. § 413.89(e)," *id.* at 28; Pls.' Mem. at 25.  None of these documents are included in the AR.  When reviewing an agency decision under the APA, "[i]t is 'black-letter administrative law that . . . a reviewing court should have before it neither more nor less information than did the agency when it made its decision.'"  *CTS Corp.*, 759 F.3d at 64 (quoting *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013)).  Since neither party moved to supplement the AR and the documents are not part of the AR, *see generally* AR, the Court will not consider them.

than 120 days after the first bill was sent to the patient, thus preventing the presumption of noncollectibility from applying.[18] *Lourdes* at 105, ECF No. 15-1.  The Administrator addressed two issues: (1) "whether the Provider correctly claimed bad debts before the passage of more than 120 days from the first billings," and (2) "whether the Provider met its burden of showing that it properly offset recovered amounts against previously claimed bad debts." *Id.*  The CMS Administrator reversed the PRRB and allowed reimbursement of the bad debt at issue. *Id.* at 108.  Notably, the issue of whether bad debt pending at a collection agency was reimbursable was neither addressed nor resolved.[19] *See generally id.*

Indeed, other PRRB decisions cite *Lourdes* only for the proposition that providers may show, through specific evidence, that a debt was actually uncollectible, with no likelihood of recovery, in fewer than 120 days. *See Bluegrass Reg'l Med. Ctr. v. Blue Cross & Blue Shield Ass'n*, No. 98-D63, 1998 WL 349510, at *7 (P.R.R.B. June 11, 1998); (citing *Lourdes* for proposition that bad debts can be declared uncollectible fewer than 120 days after first bill is sent if "there was substantial evidence including testimony and the provider's historical experience that established the subject debts as uncollectible"); *Greenview Hosp. v. Blue Cross & Blue Shield Ass'n*, Case No. 99-D1, 1998 WL 773618, at *6 (P.R.R.B. Oct. 5, 1998) (same).

In addition to these PRRB decisions, a component of HHS, the Bureau of Policy Development, characterized *Lourdes* as standing for the proposition that "the [agency's] policy

---

[18] The *Lourdes* decision was provided as Exhibit Four to the plaintiffs' corrected Motion for Summary Judgment, ECF No. 15-1, and page citations to this decision refer to the ECF page number in this docket entry.
[19] The plaintiffs' contend that "*Lourdes* is not an outlier" in the agency's adjudications but is "a continuation of agency policy" as expressed in *Scotland*. Pls.' Mem. at 23.  *Lourdes* does not reference *Scotland*, which tends to discredit the plaintiffs' theory that *Lourdes* is a continuation of a policy expressed in *Scotland*.  In any event, *Scotland* analyzed the treatment of Medicare and non-Medicare bad debt under an obsolete policy, *see supra*, and *Lourdes* addressed whether bad debt could be reimbursable if evidence showed the debt met the four criteria in 42 C.F.R. § 413.89(e) before 120 days had elapsed.  *See Lourdes* at 107; *Scotland* at 111.  Thus, *Lourdes* and *Scotland* addressed entirely different issues, and neither decision addressed the issue whether Medicare bad debt pending at a collection agency is reimbursable under 42 C.F.R. § 413.89(e).

permits claiming of bad debts in 120 days or less only when providers are able to show that a *particular debt* was 'actually uncollectible when claimed as worthless' in accordance with the criterion in" the Medicare regulations. *Bluegrass Reg'l Med. Ctr.*, 1998 WL 349510, at *4 (quoting Administrator's letter dated September 15, 1995) (emphasis in original). In short, *Lourdes* was initially interpreted as a clarification of when a provider could be reimbursed for bad debts pending for fewer than 120 days, rather than having precedential value regarding the question of whether active accounts at collection agencies may be reimbursed.[20]

The plaintiffs rely heavily on the factual circumstance in *Lourdes* that the Medicare bad debt accounts found by the PRRB to be reimbursable were still active at a collection agency, but this particular circumstance was not highlighted as a legal issue for resolution. *See generally Lourdes*. Instead, the legal issue at stake—and resolved—was whether debt, which was proved by other evidence to be actually uncollectible, could be reimbursed even if the debt had been pending for fewer than 120 days. *Lourdes* at 107–08. In this respect, *Lourdes* certainly does not reflect any explicit statement of policy on whether bad debt at a collection agency is reimbursable. Significantly, unlike the instant case, *Lourdes* involved the re-opening of a previous year's audit and additional proof that many of the bad debts in question at the collection agency had ceased to be active and were, in fact, uncollected. *See id.* at 105; *In re: George Washington Univ. Hosp.*, No. 2011-D31, 2011 WL 4499599, at *9 n.18 (Admin. Decis. July 26, 2011) (describing factual circumstances in *Lourdes*). Consequently, to the extent that the plaintiffs argue that *Lourdes* proves that the agency did not have the policy regarding bad debt

---

[20] Later PRRB decisions did interpret *Lourdes* as supporting the plaintiffs' position, *see, e.g., Dameron Hospital v. BlueCross BlueShield Ass'n*, No. 2006-D16 (PRRB Feb. 17, 2006), but those PRRB decisions were rejected by the Administrator as an erroneous interpretation, *see In re: Dameron Hospital*, No. 2006-D16, 2006 WL 1684657, at *8 (Admin. Decis. Apr. 17, 2006); Def.'s Mem. at 15 n.5.

reimbursement now claimed, Pls.' Mem. at 21, *Lourdes* is distinguishable on its facts and has

limited, if any, precedential value.

Another post-Moratorium PRRB decision is more directly on point, although neither

party discusses it in detail.[21]  In *Methodist Hospital of Dyersburg v. Blue Cross and Blue Shield*

*Association* (*Dyersburg*), No. 2000-D56, 2000 WL 796345, at *2 (P.R.R.B. May 30, 2000), a

provider challenged the disallowance of reimbursement for debts, which had been turned over to

a collection agency, claiming that the four criteria for bad debt reimbursement, under 42 C.F.R. §

413.89(e), were satisfied.  The provider contended that "[a]lthough the Provider had ceased its

internal collection efforts, [a collection agency] continued to attempt to collect the debt" at the

same time the provider sought reimbursement.  *Id.*  The PRRB held "that the bad debts were

'uncollectible' *when turned over to the collection agency*, thus meeting both the four (4) criteria

of 42 C.F.R. § 413.8[9](e), and the 120 days rule" in PRM § 310.2.  *Id.* at *8 (emphasis added).

Consequently, the PRRB reversed the Intermediary's decision disallowing the bad debt and

ordered the provider reimbursed.  *Id.* at *9.

The factual situation in *Dyersburg* is closely analogous to the facts in this matter.  In

*Dyersburg*, as here, the provider pursued and exhausted its internal collection efforts and then

turned the debt over to a collection agency for further efforts.  *Compare id.* at *2–3 *with* AR at

10–11.  In *Dyersburg*, the bad debt was reimbursed despite the accounts being active at a

collection agency, while in the instant matter, the bad debt reimbursement was disallowed.

*Compare Dyersburg*, 2000 WL 796345, at *9 *with* AR at 20–21.  *Dyersburg* is not

distinguishable from the instant facts, as is *Lourdes*, since there is nothing in *Dyersburg* to

---

[21] The plaintiffs devote three sentences to *Dyersburg*, Pls.' Mem. at 32, and the defendant mentions this decision in only two sentences in a footnote, Def.'s Mem. at 17 n.6.

indicate that the audits in that case were reopened or that all of the bad debt claimed was sent for reimbursement fewer than 120 days after the first bill was sent to the patient.

Although the holding in *Dyersburg* is directly contrary to the position advanced by the agency in this case, this decision was not overturned by the Administrator within the statutory timeframe. *See generally Dyersburg*, 2000 WL 796345.  The Administrator recognized the contradiction in *In re: St. John Health*, No. 2014-D19, 2014 WL 7213279, at *8–9 (Admin. Decis. Oct. 23, 2014), where the Administrator reversed the PRRB's allowance of reimbursement for debt pending with a collection agency.  In *St. John Health*, the Administrator summarized agency policy for bad debt reimbursement as follows: "when a provider sends uncollected amounts to a collection agency, the provider cannot establish reasonable collection efforts have been made, the debt was actually uncollectible when claimed as worthless and that there is no likelihood of recovery."  *Id.* at *7.  The Administrator went on to discuss the policy reasons for the agency's practice.  *Id.* at *8.  In rejecting the PRRB's suggestion that PRM § 316 "makes harmless any premature claiming of unpaid amounts as bad debts, as later collected amounts are offset," the Administrator explained:

> once the debt is allowed [to be reimbursed] there is no longer any incentive to continue to make collection efforts.  Consequently the Administrator concludes that, under longstanding Medicare law and policy, if a Provider continues collection efforts at an outside collection agency, then the Provider has not complied with the regulatory criteria set forth at 42 C.F.R. § 413.89(e)(3) and (4) and the provisions of Chapter 3 of the PRM.

*Id.*

In *St. John Health*, the Administrator further opined that allowing Medicare bad debts to be reimbursed while pending at a collection agency resulted in a substantial difference between the treatment of Medicare and non-Medicare debts, in contravention of the over-arching policy of equal treatment of both Medicare and non-Medicare accounts, stating that "[t]o suggest that,

as long as the Provider conforms to this requirement of sending both Medicare and non-Medicare accounts to [a] collection agency, it can immediately claim the Medicare debts while collection activities continue nullifies the effects, intent and purpose of section 310.A" of the PRM.  *Id.*  "It would be meaningless to require similar treatment" between Medicare and non-Medicare accounts "while concurrently allowing the provider to write-off the unpaid coinsurance and deductibles while the accounts are still at the collection agency." *Id.*  Such a policy would result in dissimilar treatment of the two types of debt—collection efforts for non-Medicare debts continue until a determination by the provider that keeping the debt with a collection agency is no longer worthwhile, while Medicare debts are written off and submitted for reimbursement long before the referral has concluded.  *See id.*  In other words, consistent with the regulations barring differential treatment of Medicare and non-Medicare debt, providers choosing to send delinquent accounts to a collection agency may not treat Medicare debt as entirely uncollectible when such debt remains pending at a collection agency along with non-Medicare debt, based on the business judgement that likely repayment of some accounts outweighs the cost of engaging the collection agency.

*St. John Health* also recognizes the contradictory language in *Dyersburg* and, to a lesser extent, *Lourdes*.  *Id.* at *9 and *9 n. 15.  The Administrator addressed the contradiction directly, stating "[t]o the extent that any Administrator decision cannot be distinguished and has expressed policy that deviated from the existing policy," as advanced by the agency in this matter, those decisions are "erroneous and contrary to the moratorium and the rules in effect on August 1, 1987."  *Id.* at *9; *see also id.* at *9 n.15 (citing *Dyersburg* as contrary to the agency's policy and the Moratorium and distinguishing *Lourdes*).  Given the deference due to the agency in interpreting its own regulations, the clear statement of the agency that cases such as *Dyersburg*

and *Lourdes* were incorrectly decided and themselves in violation of the Moratorium must be given "controlling weight."  *See In re Polar Bear Litig.*, 709 F.3d at 11.

The second post-Moratorium item of evidence cited by the plaintiffs is a transmittal memorandum and 1989 amendment to the MIM.  The 1989 MIM amendment expresses the "[c]oncern" that "there is an incentive [for providers] to claim bad debts before they become worthless and to claim other than Medicare bad debts."  AR at 402.  This version of the MIM then proceeds to include the clear statement reflecting the agency policy applied by the PRRB in the challenged decision that: "[i]f the bad debt is written-off on the provider's books 120 days after the date of the bill and then turned over to a collection agency, the amount cannot be claimed as a bad debt on the date of the write-off.  It can be claimed as a bad debt only after the collection agency completes its customary collection effort."  AR at 403.

The plaintiffs seize on language used in the transmittal memorandum for the 1989 MIM amendment to argue that the concern about providers seeking reimbursement of Medicare debts prematurely "before they become worthless," and the amended language barring reimbursement until "after the collection agency completes its customary collection effort," was brand new, rather than long-standing policy.  AR at 402–03.  The transmittal memorandum was titled "NEW POLICY—EFFECTIVE DATE: For Prospective Payment System (PPS) cost report audits performed after 10/12/89."  AR at 392.  The plaintiffs seek to draw the inference from the title of the transmittal memorandum that the policy, expressed in the challenged PRRB decision and reflected in the 1989 MIM amendment, existed, at the earliest, in 1989, after the Moratorium took effect.  Pls.' Mem. at 23–24.

The plaintiffs' argument rests on too thin a reed.  The fact that the 1989 MIM amendment was announced in a transmittal bearing the title "NEW POLICY" is insufficient to render every

portion of the document "new."  *See Lawson v. FMR LLC*, 134 S. Ct. 1158, 1169 (2014) (noting

that headings for statutes are often "'but a short-hand reference to the general subject matter' of

the provision, 'not meant to take the place of detailed provisions of the text.'" (quoting *Trainmen*

*v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 528 (1947)).  Indeed, the text of document itself

described the bad debt reimbursement policy as being "updated or clarified," not new.  *See* AR at

392; *In re: Univ. Health Servs., Inc.*, 2011 WL 4499597, at *7 n.10 (CMS Admin. Decis. July

26, 2011) (discussing 1989 MIM amendments).

      In sum, the plaintiffs have provided no persuasive evidence that the agency had a

different policy regarding Medicare bad debt reimbursement for pending accounts at collection

agencies on August 1, 1987 than the policy expressed by the PRRB in the challenged decision.[22]

*    *    *

      The plaintiffs' evidence that the agency policy, which was applied in the challenged

PRRB decision to disallow reimbursement of Medicare bad debt pending at collection agencies,

changed after the effective date of the Medicare Bad Debt Moratorium, thereby violating the

Moratorium, is simply unpersuasive.  Instead, the Court finds that substantial evidence supports

the agency's finding that this policy has been a reasonable interpretation of a long-standing

agency regulation and does not conflict with the Moratorium.

---

[22] The plaintiffs repeatedly urge this Court to follow *Foothill* and *District,* and reject *Lakeland* as wrongly decided. Pls.' Mem. at 16 (stating the agency "has failed to provide any evidence, let alone substantial evidence, that the conclusions reached by the courts in *Foothill* and *District Hospital Partners* are wrong"); *id.* at 20 (alleging that the agency "has failed to show that *Foothill* and *District Hospital Partners* were wrongly decided"); *id.* at 23 (alleging that "*Lakeland* is wrongly decided and should not be followed by this Court").  While potentially persuasive, those decisions are not binding, since "District Court decisions do not establish the law of the circuit, nor, indeed, do they even establish the law of the district."  *In re Executive Office of President*, 215 F.3d 20, 24 (D.C. Cir. 2000) (internal quotation marks and citations omitted).  Based on an analysis of the evidence discussed in *Foothill* and *District*, this Court reaches a different conclusion.

### C.     The Plaintiffs' Contrary Arguments Are Unpersuasive

The plaintiffs make two additional arguments against the challenged decision, both of which arguments merely cloak their dispute over the agency's interpretation of the plain language of 42 C.F.R. § 413.89 in another guise.[23]  The plaintiffs first contend that the reimbursement policy violates the APA for failure to comply with its notice-and-comment rulemaking process.  *Id.* at 27–30.  Second, the plaintiffs contend that they did not have "fair notice" of the Secretary's policy.  *Id.* at 30–34.  These arguments are not persuasive.

### 1.     *The Agency's Reimbursement Policy Is An Interpretive Rule Exempt from Notice-And-Comment Rulemaking*

The plaintiffs advance the argument in their opening memorandum that the agency's reimbursement policy is a "legislative" rule and, therefore, should have been subjected to notice-and-comment rulemaking under the APA.  Pls.' Mem. at 27–30.[24]  According to the plaintiffs, this is a "fatal flaw in the Secretary's policy."  *Id.* at 27.  At the outset, the plaintiffs do not dispute that the underlying regulation interpreted by the reimbursement policy, 42 C.F.R. § 413.89, was subject to notice-and-comment rulemaking, *see* Notice of Proposed Rulemaking, 31 Fed. Reg. 7864, 7869 (June 2, 1966); Final Rule, 31 Fed. Reg. 14,808, 14,813 (November 22, 1966), or that participants in the Medicare system could have been alerted to the policy through

---

[23] Insofar as the plaintiffs make the equitable argument that they were entitled to rely upon the 2002 Intermediary letter to CHS, this argument is unavailing.  To the extent that the Intermediary's letter implies that Medicare bad debt pending at collection agencies was reimbursable, *see supra* Part I.D, the letter merely shows confusion as to the agency's policy.  This letter does not purport to speak for, let alone bind, the agency.  *See Thomas Jefferson Univ.*, 512 U.S. at 517 (noting that an earlier erroneous reimbursement of Medicare costs in contradiction of Medicare regulations "does not render the Secretary's interpretation of that clause invalid").  If anything, the Intermediary's letter may serve as notice to the plaintiffs that any bad debt pending at a collection agency, for which the Intermediary allowed reimbursement to the CHS plaintiffs in cost years prior to 2004, may have been reimbursed erroneously.

[24] The plaintiffs also assert the contrary argument that the "Secretary's Manual" is not entitled to *Chevron* deference because "informal agency policy statements" and lacks persuasive force.  Pls.' Mem. at 34.  While it is unclear to which "Manual" the plaintiffs are referring, the Court finds all of the manuals referenced above to be consistent and, since the agency's interpretation of its own regulation, 42 C.F.R. § 413.89(e), is not "plainly erroneous or inconsistent with the regulation," that interpretation, embodied in the various manuals, such as the MIM and the PRM, is entitled to substantial deference.  *See Decker*, 133 S. Ct. at 1337 (2013).

notice of the 1989 MIM amendment pertaining to the "Prospective Payments System Hospital Audit Guidelines," which was also issued in the Federal Register, *see* 55 Fed. Reg. 10290, 10292 (March 20, 1990).  The plaintiffs' position is that the notice provided was insufficient because the "policy at issue here [] is 'substantive,' and not merely 'interpretative.'"  Pls.' Mem. at 28. The Court disagrees.

At the outset, the plaintiffs have conceded this argument since they failed to respond to the defendant's opposing argument in their reply.  *See* Pls.' Reply at i (referencing "Fair Notice" argument in table of contents but failing to refer to notice-and-comment argument); *see generally id.* (containing no reference to interpretive rule argument).  For this reason alone, the plaintiffs' argument on this issue is rejected.  *Ass'n of Am. Physicians & Surgeons v. Sebelius*, 746 F.3d 468, 471 (D.C. Cir. 2014) (noting the "standard rule inferring concession from gaps in a plaintiff's opposition" to uphold district court's acceptance of argument as conceded when plaintiff failed to respond to the argument in its reply).  Even absent this concession, the plaintiffs' argument is unpersuasive.

While legislative rules have the "force and effect of law" and may be promulgated only after public notice and comment, *INS v. Chadha*, 462 U.S. 919, 986 n. 19 (1983) (internal quotation marks omitted), such notice and comment rulemaking is not required under the APA "for interpretive rules, general statements of policy, and rules of organization, procedure, or practice," *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014); *see* 5 U.S.C. § 553(b)(3)(A).  This exception to the notice and comment requirement was "created by Congress to accommodate situations where the policies promoted by public participation in rulemaking are outweighed by the countervailing considerations of effectiveness, efficiency, expedition and reduction in expense" and to "provide agencies with a degree of flexibility where substantive

rights are not at stake," thereby "allow[ing] administrative officers the freedom to explain what they think a regulation or statute means without undertaking cumbersome proceedings." *Sentara-Hampton Gen. Hosp. v. Sullivan*, 980 F.2d 749, 759 (D.C. Cir. 1992) (internal citations and quotation marks omitted).  The D.C. Circuit has acknowledged that "[t]he point at which a purported guidance document crosses over from being a non-binding policy statement or interpretive rule to a legislative rule sometimes may be 'enshrouded in considerable smog,'" *Ass'n of Flight Attendants-CWA v. Huerta* (*AFA*), 785 F.3d 710, 717 (D.C. Cir. 2015) (quoting *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987)), but, in this case, no such difficulty is presented since the agency's policy barring reimbursement of Medicare bad debt pending at collection agencies is plainly an interpretive rule.

A legislative rule "'establishes a standard of conduct which has the force of law,'" *id.* at 716 (quoting *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974)), and "impose[s] legally binding obligations or prohibitions on regulated parties," *id.* at 716–17 (quoting *Nat'l Mining*, 758 F.3d at 251–52).  The D.C. Circuit has explained that "[t]he most important factor in differentiating between binding and non-binding actions is 'the actual legal effect (or lack thereof) of the agency action in question.'  *Id.* at 717 (quoting *Nat'l Mining*, 758 F.3d at 242 (internal quotation marks omitted).  In contrast to a legislative rule, an interpretive one "derive[s] a proposition from an existing document whose meaning compels or logically justifies the proposition," *CHI*, 617 F.3d at 494 (internal quotation marks and citation omitted), and merely "explains how the agency will enforce a statute or regulation," *Nat'l Mining*, 758 F.3d at 252.  These guiding principles amply demonstrate that the agency's reimbursement policy is an interpretative rule.

The policy of disallowing bad debt reimbursement pending at a collection agency informs the regulated entities about the way in which the agency will interpret the applicable regulation in 42 C.F.R. § 413.89(e), and merely "'supplies crisper and more detailed lines than the [regulation] being interpreted.'" *Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 423 (D.C. Cir. 1994) (quoting *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993)). The policy has no effect on the obligations or rights of the regulated entities. On the contrary, providers remain free to choose whether to use collection agencies and to promulgate their own policies for attempting to collect bad debts. *See* PRM § 310.A. As such, the policy "does not impose any obligation or prohibition on regulated entities" or "create a new basis for enforcement or liability." *AFA*, 785 F.3d at 717. Indeed, the plaintiffs have pointed to no right or duty imposed by the agency's policy upon them, other than that already present in 42 C.F.R. § 413.89(e)—a regulation that was subject to notice-and-comment rulemaking.

Even though the policy "may alter the manner in which the [regulated] parties present themselves or their viewpoints to the agency," this alteration of behavior is not grounds for finding the policy to be a legislative rule subject to notice-and-comment rulemaking. *Nat'l Mining*, 758 F.3d at 250. "Such effects are entirely permissible under the interpretative rule exception, so long as the rule represents the agency's explanation of a statutory or regulatory provision, and the rule is not intended to substantively change existing rights and duties." *Sentara-Hampton*, 980 F.2d at 759.

Moreover, the policy of disallowing bad debt reimbursement prior to the completion of collection efforts is a reasonable interpretation of the applicable regulation, *see supra* Part III.A, and, thus, "derive[s] a proposition from an existing document whose meaning compels or logically justifies the proposition" and "flow[s] fairly from the substance of the existing

document," *CHI*, 617 F.3d at 494.[25]  The policy makes the requirements in the regulation

"crisper" by clarifying that Medicare debt accounts at collection agencies are not "worthless"

and that retention of such debt by collection agencies is inconsistent with the requirement that

"there is no likelihood of recovery at any time in the future." 42 C.F.R. § 413.89(e)(3) & (4).

Given the obvious interpretive features of the agency's reimbursement policy, the plaintiffs'

abandonment in reply of their argument that this policy should have been treated as a legislative

rule subject to notice-and-comment rulemaking, is unsurprising.

Accordingly, even had the plaintiffs not abandoned this argument and, therefore,

conceded it, the argument fails since the agency's policy is an interpretive rule and exempt from

notice-and-comment rulemaking pursuant to 5 U.S.C. § 553(b)(3)(A).

### 2.    *"Fair Notice" of the Agency's Reimbursement Policy Was Provided*

The plaintiffs' final, related argument—that they had inadequate notice of the agency's

policy—fares no better.  Pls.' Mem. at 30–34.  At most, the plaintiffs have shown that some

confusion may have existed when the Moratorium became effective as to whether Intermediaries

were required to disallow bad debts pending at collection agencies.  By 1989—two short years

after the Moratorium was enacted and over the same time period as Congress considered the last

Moratorium amendment—the agency included in the MIM the unequivocal statement that bad

---

[25] The plaintiffs rely heavily in their opening brief on *CHI* as support for their argument that the policy is a legislative rule, but that reliance is misplaced.  *See* Pls.' Mem. at 28–29.  In *CHI*, the court rejected a Medicare rule set out in the PRM prohibiting certain insurance companies from investing more than ten percent of their assets in equities.  *See CHI*, 617 F.3d at 492, 497.  The *CHI* court found the ten percent rule to be "arbitrary" and "rigid," such that notice-and-comment rulemaking was required, since the numerical threshold was not a logical outgrowth of the regulations and statutes governing Medicare providers' malpractice insurance carriers, which regulations purported only to define "reasonable costs" that could be reimbursed by the program, and the rule imposed affirmative duties and obligations on the regulated entities limiting their ability to purchase certain types of investments.  *Id.* at 495–96 (noting that "there is no way an interpretation of 'reasonable costs' can produce the sort of detailed—and rigid—investment code set forth" in the challenged PRM provision).  By contrast, the agency's bad debt reimbursement policy at issue here is a reasonable interpretation giving effect to each of the four criteria in 42 C.F.R. § 413.89(e), and, rather than being a "rigid" rule, does not impose any affirmative obligation on providers regarding their business decision whether to use a collection agency.

debt may "be claimed as a bad debt only after the collection agency completes its collection effort" and debt "turned over to a collection agency . . . cannot be claimed as a Medicare bad debt on the date of the write-off."  AR at 402–03.  The plaintiffs cite certain decisions, such as *Dyersburg* and *Lourdes*, which seem to contradict this policy, Pls.' Reply at 21, but those decisions are either distinguishable or have been expressly disavowed by the agency as erroneous.  *See supra* Part III.B.  The plaintiffs also ignore the substantial number of cases contemporaneous with *Lourdes*, and pre-dating *Dyersburg*, that affirmed the disallowance of debt still pending at collection agencies.  *See Lakeland*, 958 F. Supp. 2d at 9 (noting policy statement in Administrator decision that "until a provider's reasonable collection effort has been completed, including both in-house efforts and the use of a collection [agency], a Medicare bad debt may not be reimbursed as uncollectible" (quoting *Humana Hosp. v. Aetna*, HCFA Admin. Decision (Sept. 11, 1992)); Def.'s Reply Pls.' Opp'n Def.'s Mot. ("Def.'s Reply") at 7 n.2, ECF No. 23 (collecting following administrative cases: *Humana Hospital v. Aetna*, HCFA Admin. Decision, at 5-6 (Sept. 11, 1992), *Univ. Hosp. v. Blue Cross and Blue Shield of Georgia*, HCFA Admin. Decision, at 5-7 (Aug. 21, 1995); *Mem'l Hosp. v. Blue Cross and Blue Shield of Nebraska*, 1996 WL 860643, at *4, HCFA Admin. Decision (March 22, 1996); *Detroit Receiving Hosp. v. Blue Cross and Blue Shield Ass'n*, 1996 WL 887671, at *4, HCFA Admin. Decision (Oct. 7, 1996); *Arlington Hosp. v. Blue Cross and Blue Shield of Virginia*, 1997 WL 420393, at *5, HCFA Admin. Decision (June 13, 1997); *Baystate Med. Ctr. v. Aetna*, 1997 WL 786228, at *3, HCFA Admin. Decision (Aug. 4, 1997)).

The plaintiffs point to a 1998 letter from an accountant in a component of Medicare's central office to a CMS regional office answering a series of questions about bad debt as further support for their contention that they had no reason to know of the agency's policy.  Pls.' Mem.

at 31.[26]  This correspondence is ambiguous, at best, and does not necessarily support the

plaintiffs' contention.  The letter asked, in the context of a hypothetical, whether bad debt, which

had been subjected to in-house collection efforts for sixty days and a collection agency for sixty

days, with no debt recovered, could be reimbursed if the debt was still being actively pursued at

the collection agency.  Pls.' Ex. 3 at 99, ECF No. 15-1.  The letter offers two "possible answers"

from which the accountant was to choose: (A) that the provider could only claim the bad debt as

reimbursable "when the collection agency decides the amount cannot be collected" or (B) "the

bad debt can be claimed at the end of the first 120 days of total collection effort even if the

collection agency is still working the account."  *Id.*  The accountant responding to the letter does

not simply chose between the two options but conditions the selection of option (B), with

additional verbiage, stating that "(B) is appropriate since it specifies that both Medicare and non-

Medicare claims have been written off their books as accounts receivable."  *Id.* at 102.  This

response appears to focus only on whether the Medicare and non-Medicare debt were treated

similarly, not whether the debts' active status at the collection agency rendered the debt

uncollectible.  At best, the letter merely confirms that some confusion existed among some

participants in the complex Medicare system after the Moratorium took effect as to whether such

debt was reimbursable.

　　　While the plaintiffs have supplied evidence of confusion by some intermediaries and an

accountant in a Medicare component seventeen years ago, this does not prove lack of fair notice

to the plaintiffs of the agency's policy.  *See Lakeland*, 958 F. Supp. 2d at 9.  In light of the plain

text of 42 CFR § 413.89(e), which makes clear that bad debt may only be reimbursed if all four

---

[26] The 1998 letter was not included in the AR considered by the agency, nor does the index to the AR reflect this
document, making its consideration on the merits of the parties' dispute inappropriate. This letter appears to be
discussed only as to the issue of fair notice of the agency's reimbursement policy, however.

criteria are met, and the 1989 MIM, which expressly confirmed that bad debt still pending at a collection agency was not reimbursable, by 2004 (the first challenged cost year),[27] the plaintiffs had been "fairly notified . . . of the agency's interpretation." *Gen'l Elec. Co. v. EPA,* 53 F.3d 1324, 1329 (D.C. Cir. 1995); *see also Suburban Air Freight, Inc. v. TSA*, 716 F.3d 679, 683–684 (D.C. Cir. 2013) (noting court may uphold regulation as reasonable and find lack of notice in "very limited set of cases" only when clear statement of policy completely unavailable); *Howmet Corp. v. EPA*, 614 F.3d 544, 554 (D.C. Cir. 2010) (finding published regulation with interpretive manual published one year after regulation, both of which were issued "thirteen years before the conduct at issue" were sufficient to put petitioner on notice of agency's interpretation). In addition, decisions of the PRRB and the Administrator applied this policy multiple times. *See Lakeland*, 958 F. Supp. 2d at 9 (collecting cases). Thus, the plaintiffs' notice argument fails.

## IV.   CONCLUSION

The PRRB decision challenged by the plaintiffs applied an interpretation of a long-standing Medicare regulation to disallow reimbursement of Medicare bad debt pending at a collection agency, based upon the PRRB's analysis that such debt could not satisfy the requirements of 42 C.F.R. § 413.89(e)(3) and (e)(4). That interpretation is reasonable and must be given "controlling weight," since the interpretation is not "'plainly erroneous or inconsistent with the regulation.'" *Auer*, 519 U.S. at 461. Moreover, the plaintiffs have not presented persuasive evidence to show that agency changed this interpretation of a long-standing regulation, in violation of the Medicare Bad Debt Moratorium. Accordingly, the defendant's

---

[27] Notice of changes to the 1989 MIM was published in the Federal Register, as the plaintiffs concede. Pls.' Mem. at 34.

motion for summary judgment is granted and the plaintiffs' cross-motion for summary judgment is denied.

An Order consistent with this Memorandum Opinion will issue contemporaneously.

Date: July 7, 2015

_____
BERYL A. HOWELL
United States District Judge